D.O., Appellant,

v.

**TEXAS DEPARTMENT OF HUMAN SERVICES, Appellee.**

No. 3–91–228–CV.

Court of Appeals of Texas, Austin.

March 17, 1993.

Richard E. Criss, Jr., Austin, for appellant.

Ronald Earle, Dist. Atty., C. Bryan Case, Jr., Barrett Denum, Asst. Dist. Attys., Austin, for Texas Dept. of Human Services.

Cynthia Bryant, Children's Rights Clinic, University of Texas Law School, Austin, ad litem for the Children.

Before POWERS, ABOUSSIE and B.A. SMITH, JJ.

1. By the same order, the district court terminated the parent-child relationship between T.N.O.

BEA ANN SMITH, Justice.

Appellant D.O. appeals from a decree of termination of parental rights rendered by the district court of Travis County. The district court terminated the parent-child relationship between D.O. and his daughter T.N.O.[1] and appointed appellee Texas Department of Human Services ("TDHS") permanent managing conservator. We will affirm the decree of termination.

■ A court may terminate a parent-child relationship if it finds that (1) the parent has engaged in any of the specific conduct enumerated in the Family Code as grounds for termination; *and* (2) termination is in the child's best interest. Tex. Fam.Code Ann. § 15.02(1), (2) (West Supp. 1993); *Texas Dept. of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987); *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex. 1976); *Smith v. Sims,* 801 S.W.2d 247, 251–52 (Tex.App.—Houston [14th Dist.] 1990, no writ). Here, the trial court found: (1) that D.O. knowingly placed T.N.O., or knowingly allowed her to remain, in conditions or surroundings that endangered her physical or emotional well-being, § 15.-02(1)(D); (2) that he engaged in conduct, or knowingly placed T.N.O. with persons who engaged in conduct, that endangered her physical or emotional well-being, § 15.-02(1)(E); (3) that a court had previously terminated his parent-child relationship with respect to another child, § 15.02(1)(M); and (4) that termination was in T.N.O.'s best interest, § 15.02(2).

In six points of error, D.O. contends that no evidence and, alternatively, factually insufficient evidence exists to support the trial court's first, second, and fourth findings. In a seventh point of error D.O. challenges the constitutionality of section 15.02(1)(M) of the Family Code that permits termination solely upon a finding that a parent's rights to another child have been terminated and that termination is in the best interest of the child the subject of this suit.

and her mother.

## STANDARD OF REVIEW

 TDHS had the burden to prove the elements necessary for termination by clear and convincing evidence. *In re G.M.,* 596 S.W.2d 846, 847 (Tex.1980); *Neal v. Texas Dept. of Human Servs.,* 814 S.W.2d 216, 222 (Tex.App.—San Antonio 1991, writ denied); *see Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) (function of standard of proof is to instruct the factfinder concerning the degree of confidence society thinks it should have in correctness of factual conclusions). The clear and convincing standard of proof requires "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re G.M.,* 596 S.W.2d at 847.

 When both no-evidence and factual-sufficiency challenges are raised, we must first examine the legal sufficiency of the evidence. *Glover v. Texas Gen. Idem. Co.,* 619 S.W.2d 400, 401 (Tex.1981). In deciding a no-evidence point, we consider only the evidence and inferences tending to support the finding and disregard all evidence to the contrary. *Alm v. Aluminum Co. of Am.,* 717 S.W.2d 588, 593 (Tex.1986); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965); *In re S.H.A.,* 728 S.W.2d 73, 90 (Tex.App.—Dallas 1987, no writ).

 In deciding whether the evidence is factually sufficient, this Court considers and weighs all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *see also Pool v. Ford Motor Co.,* 715 S.W.2d 629 (Tex.1986). The clear and convincing standard of proof required to terminate parental rights does not alter the appropriate standard of appellate review. *State v. Turner,* 556 S.W.2d 563, 565 (Tex.1977); *Meadows v. Green,* 524 S.W.2d 509, 510 (Tex.1975) (evidence is reviewed by only two standards: factual and legal sufficiency); *Browning–Ferris Indus., Inc. v. Zavaleta,* 827 S.W.2d 336, 341 (Tex.App.—Corpus Christi 1991, writ denied); *see Director of the Dallas County Child Protective Servs. Unit v. Bowling,* 833 S.W.2d 730, 732 (Tex.App.—Dallas 1992, no writ) (clear and convincing evidence standard is correct standard for jury evaluation and not standard for instructed verdict).

We recognize that many courts, including this one, have described an *intermediate standard of appellate review* in such cases. "[I]t is the duty of the appellate court in reviewing the evidence to determine, not whether the trier of fact could reasonably conclude that the existence of a fact is more probable than not, but whether the trier could reasonably conclude that the existence of the facts is highly probable." *Neiswander v. Bailey,* 645 S.W.2d 835, 835–36 (Tex.App.—Dallas 1982, no writ); *see also Williams v. Texas Dep't of Human Servs.,* 788 S.W.2d 922, 926 (Tex. App.—Houston [1st Dist.] 1990, no writ); *In re L.R.M.,* 763 S.W.2d 64, 66–67 (Tex. App.—Fort Worth 1989, no writ); *G.M. v. Texas Dep't of Human Resources,* 717 S.W.2d 185, 187 (Tex.App.—Austin 1986, no writ); *compare Doria v. Texas Dep't of Human Resources,* 747 S.W.2d 953, 955 (Tex.App.—Corpus Christi 1988, no writ); *Baxter v. Texas Dep't of Human Resources,* 678 S.W.2d 265, 267 (Tex.App.— Austin 1984, no writ). In *L.R.M.,* the court recognized an intermediate standard but proceeded to "determine whether the evidence at trial was factually sufficient to support a finding of clear and convincing evidence." *L.R.M.,* 763 S.W.2d at 67. After reviewing these cases, we determine that this suggested intermediate standard of appellate review is incorrect. *See Doria,* 747 S.W.2d at 955; *Baxter,* 678 S.W.2d at 267. The standard for factually-sufficient review is as stated in *In re King's Estate, Cain,* and *Pool.*

## BACKGROUND

D.O. and K.O. married in 1978; they divorced in April 1987. T.N.O. was born in November 1987; because the couple was unaware of K.O.'s pregnancy in April 1987, the divorce decree does not mention this

child in utero and makes no provisions for her custody or support. Four other children were born of this marriage. In April 1986, a court terminated the couple's parental rights to three of these children; K.O.'s parents adopted a fourth child in 1987.

Following her divorce from D.O., K.O. married David Englehardt in June 1988; one child, A.O., was born of that marriage. (Although David Englehardt was A.O.'s biological father, she bore the same surname as her mother and half-sister, T.N.O.) The trial court terminated K.O. and David Englehardt's parental rights to A.O., and K.O.'s parental rights to T.N.O., but this appeal involves only D.O.'s challenge to the termination of his parental rights to T.N.O.

Following their divorce, K.O. and D.O. continued to live together off and on, even after K.O. married David Englehardt. There was evidence that D.O. at times provided housing and support for not only K.O. and T.N.O., but also for A.O. and David Englehardt.

Each of these three adults has a criminal record that bears on the matter before us. In 1985, K.O. was convicted of injury to a child for failing to protect one of her children from her then boyfriend, Mario Benevides, and for failing to procure medical treatment for the child after Benevides placed the child in scalding water. At the time, D.O. had entrusted the children's care to K.O. because he was in the penitentiary for theft by check; he had previously been convicted for criminal trespass and the unauthorized use of a motor vehicle. Following the incident of the scalding water, D.O. and K.O.'s parental rights to three of their children were terminated in April 1986. In 1990, K.O. was convicted of kidnapping one Robert Walker who was later murdered. She was sentenced to twenty years and was in the penitentiary during the time of the trial below.

When K.O. and David Englehardt married, he was on probation for a forgery conviction; his probation was revoked when he was convicted of the unauthorized use of a motor vehicle in July 1989. He served time in prison between July 1989 and March 1990. Soon after his release, he

was convicted of an especially brutal rape of a seventy-year-old woman in May 1990 and was sentenced to ninety-nine years' confinement. Like K.O., he was in state prison at the time of the trial.

K.O.'s daughters, T.N.O. and A.O., were taken into custody by TDHS in January 1990 when K.O. was arrested for kidnapping; T.N.O. was two years old, A.O. was one. When TDHS took possession of T.N.O., she was dirty, had a rash, and required extensive dental care. While in a foster home, she acted aggressively toward A.O. and, at one point, the children were put in separate homes. The children remained in foster care through the date of the trial. Of the three adults, D.O. was the only one not incarcerated after TDHS picked up the children. He was entitled to supervised visits with both children for one hour every two weeks while they remained in foster care.

## SURROUNDINGS AND CONDUCT THAT ENDANGERED T.N.O.

■ By his first two points of error, D.O. complains that there is no evidence or factually insufficient evidence that he knowingly placed T.N.O., or knowingly allowed her to remain, in conditions that endangered her physical or emotional well-being. § 15.02(1)(D). In his third and fourth points of error, D.O. raises the same challenge to the trial court's finding that he engaged in conduct, or knowingly placed T.N.O. with persons who engaged in conduct, that endangered T.N.O.'s physical or emotional well-being. § 15.02(1)(E). We will discuss all four points of error together as we review the evidence to see if it is legally and factually sufficient to uphold the trial court's findings.

We begin by citing with approval the holding of *In re B.R.*, 822 S.W.2d 103, 106 (Tex.App.—Tyler 1991, writ denied), "that abusive or violent conduct by a parent or other resident of a child's home can produce an environment that endangers the physical or emotional well-being of a child within the ambit of section 15.02(1)(D)." *But see G.M.*, 717 S.W.2d at 187–88. There is ample evidence in this record of violent

conduct within the household where D.O. permitted his daughter to live, and where he at times lived as well.

David Englehardt, by his own admission, has a problem controlling his anger. Other evidence established that Englehardt was a violent man. In June 1989, he sexually assaulted K.O. K.O. testified that she could not remember how many times he had assaulted her, physically and sexually, but she continued to live with him and to have her daughters live with him after these assaults. She testified that the children were often present when he assaulted her, but that he had never hurt them. There was testimony that Englehardt physically assaulted other members of the household, including K.O.'s friend, Christine Carlson. On another occasion, during a fight with K.O., Englehardt tore up Carlson's house, ripping the telephone out and breaking personal items.

D.O. testified that he knew Englehardt was a violent man and that he was aware of Englehardt's violent relationship with K.O. Indeed, D.O. was often present when the violence occurred and there was testimony that on more than one occasion Englehardt also assaulted D.O. On one occasion, D.O. reported to the police that Englehardt had kidnapped K.O., T.N.O., and A.O.

Knowing of the violent relationship between Englehardt and K.O., and knowing that K.O. had a history of not protecting her children from violent boyfriends, D.O. made no effort to remove T.N.O. from this unstable household, populated by ex-felons engaged in ongoing criminal activity, where violence regularly occurred.

There was evidence that T.N.O.'s physical and emotional well-being was jeopardized in this environment. When she was picked up by TDHS in January 1990, she was dirty, had a rash, had not been properly immunized, and suffered from "bottle mouth"[2] that required extensive dental treatment. While in foster care, T.N.O. exhibited uncontrolled aggression toward her younger sister, A.O. There was testi-

mony that T.N.O. was developmentally delayed.

After careful review of this record, we are persuaded that clear and convincing evidence exists that is both legally and factually sufficient to support the trial court's finding that D.O. (1) knowingly allowed T.N.O. to remain in surroundings that endangered her physical or emotional well-being, and (2) knowingly placed T.N.O. with persons who engaged in conduct that endangered her physical or emotional well-being. We overrule the first four points of error.

## CHALLENGE TO CONSTITUTIONAL-ITY OF SECTION 15.02(1)(M)

In his seventh point of error, D.O. challenges the constitutionality of section 15.-02(1)(M), which permits a court to terminate an individual's parental rights solely on a finding that there has been a prior termination of that parent's rights to another child and that such a termination would be in the best interest of the child. Having found that there is legally and factually sufficient evidence to support the termination of D.O.'s parental rights under sections 15.02(1)(D) and (E), we are not presented with a situation that requires us to determine if termination based solely on section 15.02(1)(M) is constitutionally sound, and we decline to reach that issue today. *Horton v. Horton*, 625 S.W.2d 78, 79 (Tex.App.—Fort Worth 1981, writ ref'd n.r.e.). We overrule the seventh point of error.

## BEST INTEREST OF THE CHILD

In his fifth and sixth points of error, D.O. challenges the legal and factual sufficiency of the evidence to support the finding that termination of his parental rights would be in T.N.O.'s best interest. The supreme court has recognized several factors that may be considered in determining when termination is in a child's best interest:

(A) the desires of the child; (B) the emotional and physical needs of the child

---

**2.** The TDHS caseworker testified that "bottle mouth" occurs when a bottle of milk or juice is left in a child's mouth for long periods of time, causing the teeth to rot.

now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse of the acts or omissions of the parent.

*Holley v. Adams,* 544 S.W.2d 367, 372 (Tex. 1976) (footnotes omitted). This list of relevant considerations is not exhaustive and other factors may be considered when appropriate.

The desires of the child were not considered in this case due to her tender age. There was considerable evidence that the emotional and physical needs of the child had not been adequately met when the children were taken into the custody of TDHS in January 1990. As we have discussed, sufficient evidence exists to establish that the unstable and violent surroundings of K.O. and David Englehardt's household and the conduct of its members, which sometimes included D.O. and apparently included Christine Carlson after Englehardt's incarceration for rape, endangered the emotional and physical well-being of T.N.O.

That leads us to review the evidence concerning the parenting abilities of D.O., his plans for the child contrasted with those of TDHS, the stability of his home, and his acts or omissions that bear on the appropriateness of his parental relationship with T.N.O.

David P. Rea, the TDHS case worker, testified that D.O.'s history indicated that he would not be a good conservator for T.N.O.; although there were no reports that he injured T.N.O., there had been allegations that he both injured and neglected three other children with whom his parental rights had been terminated. Rea supervised D.O.'s visits with T.N.O. and ob-

served that she did not relate to him as a father. He also testified that D.O. did not perform appropriately as a parent, even in the limited period of the one-hour visits. He noted D.O.'s inability to deal with conflicts between T.N.O. and her younger sister:

Mr. [O.] would never—could never seem to, you know, intervene beforehand. Keeping an eye on [T.N.O.] didn't seem to be something that he did consistently on a consistent basis. The children would be running around and Mr. [O.] would be there, sometimes he would be talking more to the caseworker, myself, and the children would be doing whatever they were doing.

Additionally, Rea saw T.N.O.'s need for dental care and her delay in speech development as indicators of the limited parenting she had received.

Dr. Jeff D. Ezell, a psychologist, evaluated D.O. in September 1985, in connection with the termination of his parental rights to his three other children in April 1986. The trial court admitted Dr. Ezell's written report into evidence. Ezell described D.O. as "socially inept" with "chronically poor judgment despite his good intelligence." Additionally, the report contained this evaluation that bears on his potential parenting skills:

He shows poor planning capacity, and poor judgement with respect to consequences of his behavior. Overall, there is severe impairment in the ability to marshall well-planned sustained responses to meet basic life demands. The personality and behavioral pattern operating here are essentially passive, and the client seems to hope that others will take over his responsibilities ...

Mr. [O.] is able to state that it would first be necessary to secure adequate housing, stable living arrangements, daycare for his children, adequate employment for himself and sound financial savings before return of the children. However, his plans and realistic expectations in realizing these goals are very weak and ill-defined. Barring the presence of a great deal of outside help, it appears

extremely unlikely that Mr. [O.] will be able to stabilize his life beyond the general pattern of adjustment displayed presently and in the past. Sustained social services would be needed to insure achievement and maintenance of long-term stability of living for this client.

Further, Ezell was concerned about D.O.'s unhealthy dependence on his ex-wife K.O., despite her "exceptionally inconsiderate, emotionally abusive" behavior toward him.

Dr. David Poole, a second psychologist, evaluated D.O. in July 1990. Dr. Poole administered several psychological tests, reviewed TDHS records, and prepared a written report that was admitted into evidence. Poole diagnosed D.O. as having "a personality disorder with narcissistic and dependent features." Poole continued, "[He] doesn't have a sense that he's really responsible for the outcome of things and what he does." When asked about D.O.'s ability to rear children, Poole answered that D.O. is distracted by his own concerns and immediate needs. Accordingly, "he's not the sort of person we really regard as appropriate for taking care of others in a practical day-to-day way." As to D.O.'s ability to provide for T.N.O.'s future needs, Poole reported:

> Mr. [O.] suggested in the course of the interview that he was prepared to take his children back into his care, yet he acknowledges that he is renting a motel room for $96.00 a week now, and is speculating about other placements, moving in with a female friends, etc., in a way that struck me as rather haphazard, particularly given his unfortunate and unstable track record of the past.

Poole concluded that he did not see D.O. as a viable candidate for primary conservator of T.N.O.

Andrew Colbert, the children's guardian ad litem, testified that termination of D.O.'s parental rights would be in T.N.O.'s best interest. Colbert believed that D.O. had emotionally endangered T.N.O. by allowing her to remain with K.O. and David Englehardt. Having known D.O. for several years, Colbert concluded that "[h]e seems to have made little progress since 1983." In a similar vein, David Rea, the caseworker assigned to this family, testified that D.O. had not benefitted from the department's services earlier with his other children and the prognosis was poor for his future effective parenting, even with the department's assistance.

In describing his future plans for T.N.O., D.O. testified that he had moved into a trailer two weeks prior to trial; before that he had lived in a motel and a boarding house. He testified that he would be relying on Christine Carlson and Debra Clay to help him take care of T.N.O. Christine Carlson did not testify, but the evidence established that she had a prior criminal record and had come to live with K.O. when David Englehardt was incarcerated. She was also the ex-wife of the man that K.O. kidnapped and who was later murdered. K.O. testified that Carlson was D.O.'s lover; D.O. testified that he and Carlson were just friends.

Debra Clay did testify at trial and acknowledged that she had been convicted and served time for manslaughter; she testified that she had been arrested for assault approximately seven months earlier but those charges had been dropped.

In reviewing the sufficiency of the evidence, an appellate court must not substitute its judgment for the factfinder's. *In re W.E.R.*, 669 S.W.2d 716, 717 (Tex.1984); *Texas Educ. Agency v. Stamos*, 817 S.W.2d 378, 388 (Tex.App.—Houston [1st Dist.] 1991, writ denied). The factfinder at trial is in a position to view the credibility of witnesses based on their presence and demeanor. The trial judge commented on the importance of demeanor evidence in this case and noted for the record Ms. Clay's demeanor:

> THE COURT: I didn't want to embarrass Ms. Clay, but I do want to note for the record that the demeanor evidence in this case has been particularly important, and the Court has found the demeanor evidence of all the witnesses particularly valuable and wanted to note for the record that Ms. Clay appeared in court today in a black T-shirt that had a picture of a bare breasted woman with crossed

ammunition belts carrying a machine gun with the label "Armed and Dangerous."

Given that K.O. was in prison at the time of the termination hearing, D.O. was the only parent who could be appointed T.N.O.'s managing conservator. The evidence does not preclude the possibility that he sought to be named managing conservator, but the testimony and the argument of counsel is more consistent with his desire to maintain some relationship with T.N.O.

Indeed, D.O.'s principal argument on appeal is that while the evidence may establish his unsuitability to be managing conservator, there is little or no evidence that he should not see T.N.O. Nothing in Dr. Poole's evaluation, he argues, would preclude D.O. from all contact with T.N.O. Poole testified only to D.O.'s limitations as a primary caretaker. Therefore, as D.O. reads this record, the evidence does not support the court's finding that termination is in T.N.O.'s best interest. We find this argument unpersuasive because it ignores the consequence to T.N.O. of D.O.'s retention of any parental rights.

David Rea testified that termination of K.O. and D.O.'s parental rights was necessary in order for T.N.O. to be eligible for adoption. Rea reported that the agency proposed to find an adoptive home for T.N.O. and her sister, A.O. He testified, subject to cross-examination, that the children's youth and other factors made them good candidates for a speedy adoption. The factfinder was able to weigh the credibility of this witness, along with the credibility of D.O. in describing his plans for T.N.O. As Rea pointed out, the consequence of not terminating D.O.'s parental rights would be to make TDHS T.N.O.'s permanent managing conservator, keeping her forever in foster care and not free for adoption. He testified that this would not be in T.N.O.'s best interest.

Andrew Colbert, the guardian ad litem, testified that adoption was in T.N.O.'s best interest because it offered her the best chance to enjoy a stable and nurturing environment. Both Rea and Colbert testified that naming the agency as permanent conservator would subject T.N.O. to the instability of numerous foster care placements and deprive her of a chance for the one-on-one attention she might receive in an adoptive home.

Even K.O. admitted on cross-examination that terminating all three parents' rights to permit T.N.O. and A.O.'s adoption would be in her daughters' best interest: "And I think that if our rights are terminated, the girls being put up for adoption, they might accidentally have a chance to lead a normal happy life."

■ The trial court is not required to ignore the consequence of its failure to terminate a parent's right to visit with his child. When the only available parent is not suitable as a primary caretaker, as the evidence showed D.O. is not, the trial court could properly determine that the impermanent foster care arrangement that would be mandated if D.O. retained any parental rights was not in T.N.O.'s best interest.

■ The *Holley v. Adams* test focuses on the best interest of the child, not the best interest of the parent. We find the court properly considered the emotional and physical needs of this child, the emotional and physical dangers confronting her, the parenting ability of D.O., his ability to benefit or not benefit from assistance with his parenting, his future plans for the child's care versus the agency's plan to find her an adoptive home, his lack of stability in his personal life despite his recent job stability, and his past omissions in removing this child and other children of his from dangerous situations. It may well have been in D.O.'s best interest to continue to have limited access to his daughter, but the evidence is legally and factually sufficient to support the trial court's decision that it was in T.N.O.'s best interest to terminate D.O.'s parental rights in order to make possible her future adoption. We overrule the fifth and sixth points of error.

## CONCLUSION

Because there is legally and factually sufficient evidence to support all four of

the challenged findings that justify terminating D.O.'s parental rights to T.N.O. under section 15.02 of the Family Code, we affirm the trial court's decree terminating D.O.'s parental rights.

Affirmed.