TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-98-00369-CV







Marion Bach, Appellant



v.



Texas Department of Protective and Regulatory Services, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT


NO. 97-05486, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING








 Appellant Marion Bach appeals from a decree terminating the parent-child
relationship between appellant and her three children and appointing appellee Texas Department
of Protective and Regulatory Services permanent managing conservator. We will affirm the
decree of termination.

 A court may terminate a parent-child relationship if it finds that: (1) the parent has
engaged in any of the specific conduct enumerated in the Family Code as grounds for termination; 
and (2) termination is in the child's best interest. See Tex. Fam. Code Ann. § 161.001(1), (2)
(West Supp. 1999); Texas Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); 
Holley v. Adams, 544 S.W.2d 367, 370 (Tex. 1976); D.O. v. Texas Dep't of Human Servs., 851
S.W.2d 351, 352 (Tex. App.--Austin 1993, no writ). Here, the trial court found: (1) that
appellant knowingly placed her children, or knowingly allowed them to remain, in conditions or
surroundings that endangered their physical or emotional well-being, see Tex. Fam. Code Ann.
§ 161.001(1)(D) (West Supp. 1999); (2) that she engaged in conduct, or knowingly placed her
children with persons who engaged in conduct, that endangered their physical or emotional
well-being, see id. § 161.001(1)(E); and (3) that termination was in the children's best interest. 
See id. § 161.001(2). In three issues, appellant contends that the evidence is factually insufficient
to support the trial court's findings. 


BACKGROUND

 Appellant married Gerrald Raymond Franklin Edwards Bach III ("Bach") in 1993. 
The couple had three children: A.B., born in July 1994; J.S.B., born in July 1996; and S.B.,
born in December 1997. Appellant testified at trial that Bach abused her repeatedly during their
marriage and during her pregnancies. Between September 1996 and April 1997, Child Protective
Services ("CPS") received four referrals alleging that appellant and Bach were abusing and
neglecting the two children they had at that time. (1) 

 Appellant testified that in April 1997 Bach beat her severely and tried to strangle
her with an appliance cord. Following the attack, appellant took A.B. and J.S.B. and moved to
the Center for Battered Women (the "Shelter"). The court issued protective orders prohibiting
Bach from going around appellant and their children. Although appellant requested these orders,
other witnesses testified that she continued to see Bach even while she was staying at the Shelter. 
 The Texas Department of Protective and Regulatory Services ("DPRS") initiated
its suit to terminate appellant's and Bach's parental rights on May 7, 1997. According to a court
investigator's report, the trial court granted show cause orders to the DPRS the same day. These
orders stipulated that if appellant left the Shelter and returned to live with Bach, DPRS would take
immediate custody of the children. On May 8, 1997, CPS workers found appellant with Bach and
J.S.B. at the CPS offices. Following an interview with a CPS case manager in which appellant
and Bach failed to explain this violation of the protective and show cause orders, DPRS removed
the two children from the couple's custody. DPRS placed the two children in foster care on May
21, 1997. When the third child, S.B., was born to appellant in the Del Valle jail (2) in December
1997, DPRS amended its termination petition to include him and also removed him to foster care. 
 On February 9, 1998, Bach filed an affidavit in which he relinquished his parental
rights. Appellant waived her right to a jury trial, and termination proceedings commenced on
February 17. Following two days of testimony, the trial court recessed so that CPS could
investigate the possibility of placing the three children with their maternal grandparents. The
proceedings resumed February 27, at which time a CPS case worker testified that the agency had
found appellant's parents to be unsuitable for placement. On April 8, the trial court issued its final
decree terminating the parental rights of both appellant and Bach. Following the trial court's
denial of appellant's motion for a new trial, appellant appealed to this Court.



DISCUSSION

 In her first issue, appellant complains that the evidence is factually insufficient to
establish that she knowingly placed or knowingly allowed the children to remain in conditions that
endangered their physical or emotional well-being. In her second issue, appellant raises the same
challenge to the trial court's finding that she engaged in conduct, or knowingly placed the children
with persons who engaged in conduct, that endangered their physical or emotional well-being. 
We will discuss both issues together.


Standard Of Review 

 The trial court's findings of fact are reviewed for factual sufficiency of the evidence
by the same standards that would apply in reviewing the factual sufficiency of the evidence
supporting jury findings. See Anderson v. City of Seven Points, 806 S.W.2d 791, 794 (Tex.
1991). To review the factual sufficiency of the evidence to support a finding on which the
appellee had the burden of proof at trial, we must consider and weigh all the evidence and should
set aside the judgment only if the evidence is so weak as to render the judgment clearly wrong and
unjust. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Garza v. Alviar, 395 S.W.2d 821,
823 (Tex. 1965); In re King's Estate, 244 S.W.2d 660, 661 (Tex. 1951). "The clear and
convincing standard of proof required to terminate parental rights does not alter the appropriate
standard of appellate review." D.O., 851 S.W.2d at 353. 


Surroundings and Conduct that Endangered the Children

 The supreme court has interpreted the term "endanger" for purposes of involuntary
termination proceedings. "While we agree that 'endanger' means more than a threat of
metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not
necessary that the conduct be directed at the child or that the child actually suffers injury." Boyd,
727 S.W.2d at 533. This Court has held that abusive or violent conduct in a child's home can
produce an environment that endangers the physical or emotional well-being of a child as
contemplated by the termination statute. See D.O., 851 S.W.2d at 354-55. There is ample
evidence in this record of violent conduct within the household where appellant permitted her
children to live. 

 Appellant herself testified of the repeated abuse she suffered at the hands of her ex-husband. In addition to the strangulation incident, appellant testified that Bach beat her about the
head and neck when she was pregnant and tried to dislocate her shoulder while shoving her against
a wall. She testified that the children were often present when Bach assaulted her, and that A.B.
tried to intervene on one occasion. There was also testimony that Bach physically abused A.B.
by throwing her down on the bed "like a sack of concrete" and almost choking her with his fingers
while trying to stop her crying. While there is no direct evidence that either of the two younger
children were physically abused, the evidence of misconduct directed towards the mother and A.B.
shows a course of conduct that has the effect of endangering the physical or emotional well-being
of all the children. See Trevino v. Texas Dep't of Protective and Regulatory Servs., 893 S.W.2d
243, 247-48 (Tex. App.--Austin 1995, no writ). Appellant also admitted that Bach had threatened
the lives of the children and that she feared he would do them physical harm. (3)

 In addition to Bach's abuse of appellant and A.B., there is evidence that appellant
allowed her children to live in physical surroundings that endangered them. Appellant testified
that the family lived in one-room camping trailer measuring ten feet by twenty-four feet. The
trailer leaked and had electrical problems. She said that she feared that turning on a light might
electrocute A.B., the oldest child. Appellant also testified that A.B. had easy access to a propane
stove, and she feared the child would turn it on. Despite these fears, appellant admitted to leaving
A.B. and J.S.B. alone in the small trailer for periods of time varying from fifteen to twenty
minutes while she went to make phone calls. 

 Arlita Allen, appellant's landlord at a trailer park on Yager Lane, also described
some of the dangerous conditions to which the children were exposed. She testified that appellant
and Bach rented a space located approximately forty-five feet from Yager Lane--a street heavily
trafficked by large construction vehicles. Allen said that she had advised Bach to put a fence
around the yard of the trailer to protect the children, but no fence was ever installed. Allen
testified that the door of the trailer opened toward Yager Lane and that appellant could not see the
door from one of the phones she used. Allen testified that appellant had left the children
unsupervised at least three times and that on one of these occasions two-year-old A.B. drove a toy
car out into Yager Lane and had to be rescued by a seven-year-old neighbor.

 There is evidence that in addition to exposing the children to hazardous
surroundings, appellant also engaged in conduct or knowingly placed the children with persons
who engaged in conduct which endangered the children's well-being. Appellant allowed her ex-husband to abuse the oldest child, A.B., as described above. Bonnie Neuendorff, an employee
of Travis County Sheriff's Office Victim's Services, testified that appellant kept J.S.B. in a crib
that was too small and in which she could not turn over. Neuendorff said that, as a result, the
back of the child's head was "almost flat as though she had never been any place but on her back." 
Appellant's own testimony revealed an incident in which she tied up A.B. so that the child could
not leave the trailer while appellant went to check on laundry. Finally, there was testimony from
appellant and others that appellant would often leave the children unsupervised in situations which
exposed them to threat of harm. Although no direct evidence indicates that S.B., only two months
old at the time of trial, was ever endangered by appellant's conduct, a parent's abusive conduct
directed toward one child will suffice to support termination as to other children. See Lucas v.
Texas Dep't of Protective and Regulatory Servs., 949 S.W.2d 500, 503 (Tex. App.--Waco 1997,
pet. denied); Texas Dep't of Human Servs. v. Bowling, 833 S.W.2d 730, 732-33 (Tex.
App.--Dallas 1992, no writ).

 After careful review of this record, we are persuaded that clear and convincing
evidence exists that is factually sufficient to support the trial court's finding that appellant: (1)
knowingly placed the children, or allowed them to remain, in surroundings that endangered their
physical or emotional well-being; and (2) engaged in conduct, or knowingly placed the children
with persons who engaged in conduct, that endangered their physical or emotional well-being. 
Either of these grounds would support termination if that were found to be in the children's best
interest. We overrule the first two issues. 


Best Interest of the Children 

 In her third issue, appellant challenges the factual sufficiency of the evidence to
support the finding that termination of her parental rights would be in the children's best interest. 
The Texas Supreme Court has recognized several factors that may be considered in determining
when termination is in a child's best interest:


(A) the desires of the child; (B) the emotional and physical needs of the child now
and in the future; (C) the emotional and physical danger to the child now and in the
future; (D) the parental abilities of the individuals seeking custody; (E) the
programs available to assist these individuals to promote the best interest of the
child; (F) the plans for the child by these individuals or by the agency seeking
custody; (G) the stability of the home or proposed placement; (H) the acts or
omissions of the parent which may indicate that the existing parent-child
relationship is not a proper one; and (I) any excuse of the acts or omissions of the
parent. 



Holley v. Adams, 544 S.W.2d 367, 372 (Tex. 1976) (footnotes omitted). This list of relevant
considerations is not exhaustive, a trial court is not required in each case to consider all of these
factors, and other factors may be considered when appropriate. See id.

 DPRS presented evidence of only some of the Holley factors. The record contains
evidence of the following factors: the physical and emotional needs of the children; appellant's
parental abilities; the parenting-assistance programs available to appellant; the stability of
appellant's home; the danger to the children's well-being; the acts or omissions of the parent; and
any excuse for those acts or omissions. 


 Emotional and physical needs

 The record contains evidence that appellant failed to ensure that the children's needs
were being met. Neuendorff visited appellant after deputies were called to the trailer on a family
violence call. Neuendorff testified that appellant told her that there was no money to provide the
children with essentials such as milk and diapers. Neuendorff also testified that the children were
drinking bottles of spoiled milk.

 There was also evidence that the children were developmentally delayed. Allison
Gouris, the children's foster mother and a special education teacher, testified that the two older
children, A.B. and J.S.B., were developmentally delayed when they came to live with her. Gouris
stated that A.B., who was almost three, had problems articulating clearly; had a limited
vocabulary; did not have the expressive or receptive language that would be expected for a child
her age; had difficulty walking; and was less coordinated than normal. Gouris also testified that
the child would throw abnormally violent tantrums. Gouris stated that J.S.B., at age eleven
months, exhibited a developmental delay of about six months in all areas when she came into
Gouris's care. Gouris said the child was just beginning to sit up and did not yet know how to
crawl, whereas a typical child would have been beginning to walk at that age. 

 Melanie Ross, A.B.'s teacher, is an expert in the education of developmentally
delayed preschoolers. Ross testified that there are three possible causes for the language delays
seen in A.B.: untreated ear infections, lack of exposure, and aphasia. (4) Ross explained "lack of
exposure" as a lack of experiences on which to draw. Ross said that A.B. "had a very limited
understanding of very general concepts typical for her age." Ross said such information--the
names of common objects and animals and things in the environment--would normally be acquired
through interaction with others and teaching by a parent. Ross testified that A.B.'s language
delays were probably due to lack of exposure, while her articulation difficulties were probably due
to a hearing defect that resulted from an untreated ear infection. Ross also testified that at the
beginning of the school year, A.B. would act out in class and had an abnormal reaction to
discipline.


 Appellant's parental abilities

 The record contains evidence regarding appellant's psychological profile and
parental abilities. Diana Verdin, a psychological associate at DayGlo, (5) testified as an expert that
appellant had been diagnosed with borderline personality and dependent personality disorders. 
Verdin explained that persons with borderline personality disorder show a pattern of instability
and have difficulty with problem solving. Verdin testified that persons with dependent personality
disorder seek to connect with someone who will make their decisions for them and take
responsibility for their daily activities. Verdin stated that personality disorders are formed from
a young age and are extremely difficult to alter with therapy. Verdin also testified that Dr. Sandy
Andrews, the psychologist who had conducted the evaluation of appellant, expressed concerns that
appellant had underlying general hostility that might be directed towards the children.

 Jeanne Vilim is a licensed professional counselor who conducted appellant's
Protective Parenting Phase 2 class and therapy. Vilim testified as an expert that appellant did not
appear to understand how to care for her children in a protective manner. Vilim expressed
concern that appellant was unable to recognize that it was not an option to neglect her children and
that certain actions presented unacceptable risks.

 Jessica Ritter was the DPRS case worker assigned to appellant in June 1997. She
testified that appellant had expressed to her that it was not inappropriate for A.B. to be in the bed
with her and her ex-husband while they were having sex. (6) Ritter also testified that in her opinion
appellant had made no progress in addressing the issues that resulted in the children being
removed.


 Parenting-assistance programs available to appellant

 The record contains evidence that although various assistance services were
available to appellant, she failed to take full advantage of the services. Several witnesses testified
that appellant seemed to make real efforts only when she was about to go to court.

 Margaret Bassett was the counselor at the Shelter with whom appellant was required
to meet. Bassett described appellant as not being fully "engaged" in the therapy and said appellant
seemed to be participating only because it was required and not out of a genuine desire to improve
her situation.

 Jessica Ritter testified that appellant did not enter one-on-one counseling regarding
her battered woman issues as mandated by the DPRS service plan. Ritter also testified that Dr.
Andrews did not expect appellant to make any progress in the Protective Parenting Program unless
she began counseling for battered women. Maryann Fisher, another CPS caseworker, testified
that appellant had made no apparent progress in working her service plan. 


 Stability of appellant's home

 Appellant and others testified regarding appellant's lack of a stable housing
situation. CPS had been unable to investigate two referrals in September 1996 and another in
January 1997 because the family moved repeatedly. Three days after the removal of the children,
appellant moved back into the trailer on Yager Lane with Bach. The next month, appellant moved
into an apartment with Bach--a violation of both the lease and the protective orders. While
appellant was in the process of being evicted in late October 1997, she was sent to jail for two
months, during which time she gave birth to her third child, S.B. When appellant was released
in December, she stayed at the Salvation Army, where Bach was also staying. At the February
1998 trial, appellant testified that she was living with a friend in a one-bedroom apartment that
would be unsuitable for the children. At the June 1998 hearing on the motion for new trial,
appellant testified that she was living in a homeless shelter.


 Emotional and physical danger and appellant's inappropriate acts or omissions

 Appellant's acts and omissions that endangered her children and that undermine the
parent-child relationship between appellant and her children are detailed above. In addition, the
record contains evidence that appellant remained connected to her abusive ex-spouse and that this
connection represented a continuing danger to the children. Maryann Fisher testified that as long
as appellant remained in a relationship with Bach, the children would be endangered. 

 Appellant's trial counsel characterized appellant's behavior as symptomatic of
battered women's syndrome. Appellant was clearly a victim of an abusive husband, and the
record shows that she was unwilling or unable to take the necessary steps to leave the situation. 
Ritter and others testified that appellant was dishonest about her continuing relationship with Bach
and that appellant did not avail herself of counseling concerning the issues she faced as a battered
woman. 

 We believe the court properly considered the emotional and physical needs of the
children, the parenting ability of appellant, her ability to benefit or not to benefit from assistance
with her parenting, her lack of stability in her personal life, the emotional and physical dangers
confronting the children, and appellant's past omissions in not removing the children from
dangerous situations. The evidence is factually sufficient on which the trial court could find from
clear and convincing evidence that it was in the children's best interest to terminate appellant's
parental rights. We overrule appellant's third issue.


CONCLUSION

 Because there is factually sufficient evidence to support all three of the challenged
findings that justify terminating appellant's parental rights under section 161.001 of the Family
Code, we affirm the trial court's decree terminating appellant's parental rights.



 

 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices Kidd and Patterson

Affirmed

Filed: April 29, 1999

Do Not Publish
1. CPS was unable to conduct investigations on the first three referrals because the family
moved.
2. Appellant was incarcerated for driving a vehicle for Bach and another man while the two
men burglarized cars and stole property.
3. Appellant divulged Bach's threats towards the children as an explanation for why she had
not left Bach.
4. Aphasia is an impairment in the ability to use words as symbols caused by a brain lesion. 
See Webster's Third New International Dictionary 99 (Philip B. Gove ed., 1986). Ross testified
that she thought aphasia was a possible cause of the child's delays because the speech and language
pathologist reported that a program for children with aphasia might help the child. There was no
testimony on whether any medical tests had been performed.
5. DayGlo provides children's services through the Department of Mental Health and Mental
Retardation.
6. Appellant testified that there was only one bed in the trailer and that appellant, Bach, and
A.B. slept in it together. Appellant testified that she and Bach engaged in intercourse while A.B.
slept and did not discontinue the activity when the child awoke.



f being evicted in late October 1997, she was sent to jail for two
months, during which time she gave birth to her third child, S.B. When appellant was released
in December, she stayed at the Salvation Army, where Bach was also staying. At the February
1998 trial, appellant testified that she was living with a friend in a one-bedroom apartment that
would be unsuitable for the children. At the June 1998 hearing on the motion for new trial,
appellant testified that she was living in a homeless shelter.


 Emotional and physical danger and appellant's inappropriate acts or omissions

 Appellant's acts and omissions that endangered her children and that undermine the
parent-child relationship between appellant and her children are detailed above. In addition, the
record contains evidence that appellant r