TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-98-00192-CV






Michael Willis, Appellant



v.



Misti Dawn Hendrix f/k/a Misti Dawn Willis and Joel Hendrix, Appellees






FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT


NO. 25,540, HONORABLE CHARLES E. LANCE, JUDGE PRESIDING 







 This case involves the involuntary termination of the parent-child relationship
between appellant Michael Willis and his daughter, J.P.W. Misti Hendrix, formerly Misti Willis,
and her husband Joel Hendrix petitioned the trial court for termination of Willis's parental rights
and for adoption of J.P.W. by Joel Hendrix. After a non-jury trial, the court ordered termination
of the parent-child relationship. (1) Willis raises four issues on appeal challenging the termination
of his parent-child relationship with J.P.W. We will affirm the trial court's order.


BACKGROUND


 On March 2, 1996, Willis and Hendrix were married. At the time, Hendrix was
pregnant with J.P.W. and Willis was serving deferred adjudication probation for arson that he
committed before he met Hendrix. In July 1996, Willis's probation was revoked and he was
sentenced to four years in prison for the arson offense. His probation was revoked when he
committed burglary of a building for which he received a one year state jail sentence that ran
concurrently with the time he was serving for the arson conviction. J.P.W. was born September
21, 1996, while Willis was serving time in prison. On January 30, 1997, the trial court granted
Hendrix's petition for divorce while Willis was still in prison. The decree designated Hendrix
managing conservator of J.P.W., named Willis the possessory conservator with only supervised
visitation rights until J.P.W. was three years old, and ordered Willis to pay child support. 

 On August 1, 1997, when J.P.W. was ten months old, and while Willis was still
in prison, Hendrix filed a petition for termination of Willis's parent-child relationship with J.P.W.
and a petition for Joel Hendrix to adopt J.P.W. In October 1997, the trial court held a hearing
and terminated Willis's parental rights even though Willis was not present or represented by an
attorney at the hearing. However, the trial court granted a motion for new trial and on January
8, 1998, held a second hearing on the termination issue. Although Willis was still in prison at the
time of the second hearing, his appointed attorney appeared, cross-examined Hendrix's witnesses,
and submitted Willis's videotaped deposition as evidence. On January 8, 1998, the trial court
ordered Willis's parental rights terminated and Willis timely perfected this appeal. Willis was
released from prison on May 15, 1998.


DISCUSSION


 A trial court may terminate a parent-child relationship if it finds that (1) the parent
engaged in any specific conduct listed in the Texas Family Code as grounds for termination, and
(2) termination is in the best interest of the child. See Tex. Fam. Code Ann. §§ 161.001 (1), (2)
(West Supp. 1999); see also D.O. v. Texas Dep't of Human Servs., 851 S.W.2d 351, 353 (Tex.
App.--Austin 1993, no writ) (citing Texas Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533
(Tex. 1987)). The trial court terminated Willis's parental rights under Family Code section
161.001(1) (E),(F), and (Q) and found that termination was in J.P.W.'s best interest. See Tex.
Fam. Code Ann. §§ 161.001(1)(E, F, Q), (2) (West Supp. 1999). Subsection 161.001(E) provides
that the court may terminate the parent-child relationship based upon endangerment to the child;
(F) provides that the court may terminate the parent-child relationship based upon the parent's
failure to support the child; and (Q) provides that the court may terminate the parent-child
relationship if the parent is incarcerated longer than two years from the date of filing the petition. 
 In a suit to terminate a parent-child relationship, the petitioner has the burden to
prove the necessary elements by clear and convincing evidence. D.O., 851 S.W.2d at 352. The
clear and convincing standard means that "measure or degree of proof that will produce in the
mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be
established." Tex. Fam. Code Ann. § 101.007 (West 1996); In re G.M., 596 S.W.2d 846, 847
(Tex. 1980); see also D.O., 851 S.W.2d at 353. The clear and convincing standard of proof
required to terminate parental rights does not alter the appellate standard for legal and factual
sufficiency review. See D.O., 851 S.W.2d at 353 (citing State v. Turner, 556 S.W.2d 563, 565
(Tex. 1977)). 


 In deciding a legal sufficiency challenge, we consider only the evidence and
inferences tending to support the judgment and disregard all evidence to the contrary. See D.O.,
851 S.W.2d at 353 (citing Alm v. Aluminum Co. of Am., 717 S.W.2d 588, 593 (Tex. 1986));
Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965); In re S.H.A., 728 S.W.2d 73, 90 (Tex.
App.--Dallas 1987, no writ). To review factual sufficiency of the evidence, we consider and
weigh all of the evidence and will set aside the judgment only if the evidence is so weak or the
evidence to the contrary is so overwhelming as to make it clearly wrong and unjust. See D.O.,
851 S.W.2d at 353 (citing Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986)). In reviewing the
sufficiency of the evidence, an appellate court must not substitute its judgment for the factfinder's.
D.O., 851 S.W.2d at 357 (citing In re W.E.R., 669 S.W.2d 716, 717 (Tex. 1984)). The factfinder
at trial, in this case the trial court, is in the position to view the credibility of witnesses based upon
their presence and demeanor. See id.

 Although Willis did not challenge the portion of the order declaring that termination
was in the best interest of J.P.W., that finding alone is insufficient to support the trial court's
order. See Tex. Fam. Code Ann. § 161.001 (West Supp. 1999); Avery v. State, 963 S.W.2d 550,
552 (Tex. App.--Houston [1st Dist.] 1997, no writ) (citing Holley v. Adams, 544 S.W.2d 367,
370 (Tex. 1976)). To support the trial court's order, we must hold that Hendrix produced
sufficient evidence that Willis engaged in conduct described in subsection (1)(E), (1)(F), or (1)(Q). 
That is, if we determine the trial court's decision was proper under any one of these subsections,
we need not reach Willis's challenges to the remaining subsections. See Avery, 963 S.W.2d at
552.

Section 161.001(1)(E)--Endangerment Basis for Termination

 In Willis's fourth issue he contends that the evidence is legally and factually
insufficient to support the portion of the trial court's judgment holding that Willis "engaged in
conduct which endangers the physical or emotional well-being of the child." See Tex. Fam. Code
Ann. § 161.001(1)(E) (West Supp. 1999). Willis argues that imprisonment alone is not sufficient
to terminate parental rights. See Boyd, 727 S.W.2d at 533; H.W.J. v. State Dep't of Pub.
Welfare, 543 S.W.2d 9, 11 (Tex. Civ. App.--Texarkana 1976, no writ). He contends that there
must be a course of conduct that endangers the child and imprisonment is only one factor. In re
Guillory, 618 S.W.2d 948, 950 (Tex. Civ. App.--Houston [1st Dist.] 1981, no writ). Willis
contends that the only evidence of his bad acts occurred before J.P.W. was born and do not
support termination based on endangerment to the child's physical or emotional well-being. 

 The parental conduct to be examined in considering termination of parental rights
includes what the parent did before the birth of the child. See Avery, 963 S.W.2d at 553;
Guillory, 618 S.W.2d at 951. "Endanger" means "to expose to loss or injury; to jeopardize." 
In re M.C., 917 S.W.2d 268, 269 (Tex. 1996) (citing Boyd, 727 S.W.2d at 533). Although
"'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that
the child actually suffers injury." Id.; see also Allred v. Harris County Child Welfare Unit, 615
S.W.2d 803, 806 (Tex. Civ. App.--Houston [1st Dist.] 1980, writ ref'd n.r.e.). 

 Hendrix testified at the hearing that J.P.W. was fifteen months old and had always
lived with her. Willis testified that before going to jail, he worked for his father's roofing
company and had a salary of between $1200 and $1500 a month. Hendrix testified that in the time
she knew Willis, he had worked for his father on only one roofing job and the rest of the time he
skipped from job to job, never keeping a job for more than about two weeks. Hendrix thought
that before Willis went to jail he might have done some illegal drugs but she did not know for sure
if he had a drug habit. Willis admitted in his deposition that he had done drugs with Hendrix
although she denied ever using drugs. When Hendrix was married to Willis he had a drinking
problem and had not finished high school. However, she was aware that he had obtained his
G.E.D. and he was attending A.A. meetings in prison. When Hendrix was seven months
pregnant, Willis attempted to rob a bank and was arrested. Because of this offense, Willis's
probation for arson was revoked and he was sentenced to prison for four years for the arson
offense and received a one-year sentence in state jail for burglary of a building. Since Willis went
to prison, Hendrix received letters from him that she considered "inappropriate, [and] that [she]
felt [were] threatening." After receiving these letters she believed that it was not in J.P.W.'s best
interest for Willis to be in the child's life. Hendrix also received a letter from Willis stating that
he "was going to see [J.P.W.] no matter what, and that he was going to be the best father no
matter what." Hendrix thought this letter sounded threatening because she thought "that he was
going to do everything he could to get to [J.P.W.]. And even if I told him that he couldn't or the
courts told him he couldn't, . . . he was going to do it. I was scared that he was going to try to
kidnap [J.P.W.] or something like that." What bothered Hendrix about the letter was that Willis
used the phrase "no matter what," meaning to her that even "if the Court tells him not to [see
J.P.W.], then he's going to try to find a way to do it, which means maybe kidnap." Hendrix
believed that Willis's attempt to rob the bank when she was seven months pregnant endangered
the physical and emotional well-being of J.P.W. She believed Willis's parental rights should be
terminated because he had been convicted of arson and burglary, had a drinking problem, had
never seen J.P.W., and made threatening remarks in letters to Hendrix. 

 Nancy Bowen, Hendrix's mother, also testified at the hearing. Bowen testified that
she did not trust Willis because he promised her that he would take care of Hendrix and J.P.W.,
which he did not do. Bowen stated that Willis "never told me the truth and I don't believe him
and I don't want [J.P.W.] to be exposed to that." As far as Bowen knew, Willis never tried to get
any money from his family through loans or by selling property to help support J.P.W. She
recalled that he had gotten a loan for a new truck before J.P.W. was born but then fell three
months behind in payments. He was also behind in payments to Sears and owed a hospital bill. 
Bowen loaned him money to have the brakes fixed on his car. Bowen paid some of his bills but
not the car loan. All total, Bowen stated that she had an oral agreement with Willis to loan him
$3,168.56 and that he has not paid any of it back. Bowen considers Willis the most irresponsible
person she knows. Bowen stated that Willis had said that his parents would help financially with
the child but no money ever came from them to help support J.P.W. She believed that Willis was
irresponsible, that he drank, and that she could never trust him with J.P.W. She thought it was
best that J.P.W. never know Willis. 

 Willis's mother, Doreen Willis, also testified at the hearing. She agreed that before
her son went to jail he had a drinking problem. She agreed that when her son was drinking he was
unreliable but that he was now attending A.A. meetings and had obtained his G.E.D. She claimed
that she did not think her son would be of any danger to J.P.W. Although she did not recall the
total amount, she and her husband had given Hendrix twenty dollars here and there to help with
the child's expenses. She did not think Hendrix used the money for the child's benefit. She and
her husband could not afford to give Hendrix money on a regular basis. She and her husband had
asked Hendrix if she needed anything and she told them "no." She also explained that her son did
not have any property that he could have sold to help support the child and there was no one from
whom he could borrow money to help him support the child. She and her husband did not even
have enough money to hire an attorney for their son or to bring an intervention suit on their own
behalf. 

 Willis testified by deposition. He explained that he would be released from prison
at the latest in May 1998. He has arranged to work for his father's roofing company when he is
released. While in prison, he completed his G.E.D. and has been attending A.A. meetings. He
acknowledged that before going to prison he had been convicted of public intoxication, arson and
burglary of a building. He believes that he has changed his life since being in prison and wants
to be a father to J.P.W.

 When reviewing the sufficiency of the evidence, the appellate court must not
substitute its judgment for the factfinder's. D.O., 851 S.W.2d at 357. In this case the trial court
was the factfinder and was able to view the credibility of witnesses considering their presence and
demeanor. Based upon the evidence presented, the trial court could have formed a firm belief that
Willis's course of conduct before going to prison and his letter writing while he was in prison
endangered J.P.W.'s physical and emotional well-being. We hold that the evidence, including the
imprisonment, shows a course of conduct which has the effect of endangering the physical or
emotional well-being of J.P.W. The trial court's basis for termination under section
161.001(1)(E) is supported by the evidence. We overrule point of error four.


CONCLUSION


 Because Willis does not complain about the trial court's determination regarding
best interest of the child, and because we have determined that sufficient evidence supports one
of the statutory bases the trial court found for termination--that Willis engaged in conduct that
endangers the physical or emotional well-being of J.P.W.--we decline to address Willis's
remaining issues on appeal. We affirm the trial court's order terminating the parent-child
relationship between Willis and J.P.W.



 ___________________________________________

 Mack Kidd, Justice

Before Chief Justice Aboussie, Justices Kidd and Powers*

Affirmed

Filed: July 15, 1999

Do Not Publish



* Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by
assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1.   Three weeks later, the trial court signed a decree granting the adoption.



tified that
she did not trust Willis because he promised her that he would take care of Hendrix and J.P.W.,
which he did not do. Bowen stated that Willis "never told me the truth and I don't believe him
and I don't want [J.P.W.] to be exposed to that." As far as Bowen knew, Willis never tried to get
any money from his family through loans or by selling property to help support J.P.W. She
recalled that he had gotten a loan for a new truck before J.P.W. was born but then fell three
months behind in payments. He was also behind in payments to Sears and owed a hospital bill. 
Bowen loaned him money to have the brakes fixed on his car. Bowen paid some of his bills but
not the car loan. All total, Bowen stated that she had an oral agreement with Willis to loan him
$3,168.56 and that he has not paid any of it back. Bowen considers Willis the most irresponsible
person she knows. Bowen stated that Willis had said that his parents would help financially with
the child but no money ever came from them to help support J.P.W. She believed that Willis was
irresponsible, that he drank, and that she could never trust him with J.P.W. She thought it was
best that J.P.W. never know Willis. 

 Willis's mother, Doreen Willis, also testified at the hearing. She agreed that before
her son went to jail he had a drinking problem. She agreed that when her son was drinking he was
unreliable but that he was now attending A.A. meetings and had obtained his G.E.D. She claimed
that she did not think her son would be of any danger to J.P.W. Although she did not recall the
total amount, she and her husband had given Hendrix twenty dollars here and there to help with
the child's expenses. She did not think Hendrix used the money for the child's benefit. She and
her husband could not afford to give Hendrix money on a regular basis. She and her husband had
asked Hendrix if she needed anything and she told them "no." She also explained that her son did
not have any property that he could have sold to help support the child and there was no one from
whom he could borrow money to help him support the child. She and her husband did not even
have enough money to hire an attorney for their son or to bring an intervention suit on their own
behalf. 

 Willis testified by deposition. He e