# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00038-CV

**Virginia Trevino and Juan Trevino, Appellants**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

### FROM THE DISTRICT COURT OF CALDWELL COUNTY, 207TH JUDICIAL DISTRICT
### NO. 99-FL-151, HONORABLE GARY L. STEEL, JUDGE PRESIDING

Appellants Juan and Virginia Trevino have four children together, daughters A.T., C.A.T., and K.T., and son J.T. At the time of trial, A.T. was nine years' old, C.A.T. was two and one half, K.T. was about fourteen months, and J.T. was almost seven and one half years' old. Virginia has another daughter, J.L., who was thirteen at trial; Juan is not her father. In November 1998, before K.T. was born, it was discovered that C.A.T. had suffered a skull fracture. The Texas Department of Protective and Regulatory Services (the Department) was called to investigate the circumstances surrounding C.A.T.'s injury. After Juan and Virginia allegedly violated a Department-imposed safety plan in April 1999, the Department removed J.L., A.T., J.T., and C.A.T. from the Trevinos' custody and filed a petition seeking to terminate the Trevinos' parental rights. When K.T. was born in August 1999, she was placed into temporary care and the Department amended its petition to include her.[1] In October 2000, the cause was presented to a jury, which found Juan's and

---

[1]  J.L. was named in the Department's original petition, but the termination action concerning her was severed into a separate cause and she was eventually returned to Virginia's custody.

Virginia's parental relationships with all four children should be terminated. The district court signed a decree of termination from which Juan and Virginia appeal.

Juan contends that section 161.001(1)(O) of the Texas Family Code, allowing for the termination of parental rights for failure to comply with a court order, is unconstitutionally vague and overbroad and an unlawful delegation of legislative power to the judiciary. *See* Tex. Fam. Code Ann. § 161.001(1)(O) (West Supp. 2002). Juan further contends the evidence was insufficient to support the verdict.

Virginia contends that the evidence was legally and factually insufficient to support termination under sections 161.001(1)(D) or (E) or to support a finding that termination was in the children's best interest. *Id.* § 161.001(1)(D), (E) (West Supp. 2002). She further contends the district court erred in submitting a jury charge on section 161.001(1)(O) and in refusing her requests for a mistrial.

Although we find this case extremely close, we hold that the evidence is factually and legally sufficient to support the jury's verdict and overrule the other issues on appeal.

**SUFFICIENCY OF EVIDENCE**

A trial court may terminate a parent-child relationship if it finds (1) that the parent has engaged in any of the conduct set out as grounds for termination and (2) that termination is in the child's best interest; the Department must establish these elements by clear and convincing proof. Tex. Fam. Code Ann. § 161.001 (West Supp. 2002); *Leal v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 315, 319 (Tex. App.—Austin 2000, no pet.); *D.O. v. Texas Dep't of Human Servs.*, 851 S.W.2d 351, 352-53 (Tex. App.—Austin 1993, no writ). Clear and convincing evidence

is an intermediate standard of proof falling between the standards of the preponderance of the evidence and proof beyond a reasonable doubt. *Leal*, 25 S.W.3d at 319. This heightened standard of proof does not change the standards by which an appellate court reviews the sufficiency of the evidence. *Id.* at 320. We review the legal sufficiency of the evidence by considering only the evidence and inferences tending to support the finding, disregarding all contrary evidence. *Id.* at 320-21; *D.O.*, 851 S.W.2d at 353. We will uphold a finding if it is supported by more than a scintilla of evidence. *Leal*, 25 S.W.3d at 321. In reviewing factual sufficiency, we view all of the evidence in a neutral light and set aside a judgment only if the evidence supporting it is so weak or contrary to the weight of the evidence as to be clearly wrong and unjust. *Id.*; *D.O.*, 851 S.W.2d at 353. We will not substitute our judgment for that of the jury. *Leal*, 25 S.W.3d at 321.

The jury was asked whether Juan's and Virginia's parental rights should be terminated under sections 161.001(1)(D), (E), or (O). Sections 161.001(1)(D) and (E) allow for termination if it is found that the parent (1) "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" or (2) "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. §§ 161.001(1)(D), (E). Conduct that "endangers" a child is more than a threat of metaphysical injury or possible ill effects of an imperfect family environment. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *Leal*, 25 S.W.3d at 325. However, the conduct need not be directed at the child or cause the child actual injury; conduct endangers a child if it exposes the child to loss or injury. *Boyd*, 727 S.W.2d at 533; *Leal*, 25 S.W.3d at 325. Section 161.001(1)(O) sets out as a

3

ground for termination a parent's failure to comply with a court order governing the return of a child removed by the Department due to abuse or neglect. Tex. Fam. Code Ann. § 161.001(1)(O).

In a termination case, it is appropriate to submit the controlling issue of whether the relationship should be terminated to the jury in the form of a broad-form question. *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990); *In re M.C.M.*, 57 S.W.3d 27, 32 (Tex. App.—Houston [1st Dist.] 2001, no pet.). When a broad-form question is submitted, we must uphold the jury's findings if any ground for termination supports the findings. *In re M.C.M.*, 57 S.W.3d at 32; *In re D.L.N.*, 958 S.W.2d 934, 937 (Tex. App.—Waco 1997, pet. denied).

## SUMMARY OF EVIDENCE

This trial lasted a week and nearly thirty witnesses testified. A summary of the testimony is necessary to evaluate the sufficiency of the evidence supporting the jury's findings.

At the time of trial, Juan and Virginia had been married for about ten years. Juan had done landscaping work in the past, but he testified he had been injured and was receiving worker's compensation. Juan testified that he and Virginia have four children and that he has two older daughters who live with their mother in San Antonio; additionally, there are three other children that might be his. He has been married four times and pays child support for "at least four" children. The Department first got involved with the Trevinos in March 1994, when Juan's oldest daughter, D.T., had bruises all over her body and face. D.T. was sixteen at time of trial. She testified that she lived with Juan from the time she was three until 1994, when she was about ten and went to live with her mother. D.T. said when Juan and Virginia became involved, D.T. was about five or six. When she was six or seven, Juan and Virginia sometimes left her alone to babysit the other children. D.T. said

4

Juan screamed at her and hit her with his hand, a broom, and a stick. D.T. said Virginia was present when Juan abused D.T. and never tried to stop the abuse; in fact, D.T. testified that Virginia sometimes laughed while Juan beat D.T. D.T. said once Juan hit her head against the floor until she passed out. Photographs were introduced from March 1994 that showed bruises on D.T.'s face, head, and body inflicted by Juan. D.T. said Juan only hit her and not the other children.

Juan admitted spanking D.T. when he was frustrated and upset. When asked about bruises on D.T.'s shoulder, chin, and face, he said she got them falling off a bicycle or because he "probably hit her by accident" or from his grabbing at her when "[s]he probably tried to escape" from him. Juan admitted that he hit D.T. on her back with a belt and said he did not know how she got bruises on her legs. He denied hitting her with anything other than his hand or a belt, and said he had since learned that he should not hit his children. He also denied banging her head on the floor and did not recall her passing out.

D.T.'s sister was fifteen years' old at trial. She testified about one night in 1994 when she, D.T., and Juan shared a bed. She woke up and felt Juan stroking her legs and stomach, which felt inappropriate and made her uncomfortable.

Jaime Ybarra, a Child Protective Specialist with the Department, became involved with the Trevinos in March 1994, when D.T.'s bruises and injuries were reported. Ybarra testified that the Department, not the Trevinos, insisted that D.T. see a doctor after she was hurt. The children were removed from the home due to medical neglect and physical abuse of D.T. Ybarra testified that the Trevinos initially denied abusing D.T., but then Juan said he had pushed her, causing her to fall off her bicycle. During therapy a couple months later, Juan admitted that he had physically

5

abused D.T. The Trevinos told Ybarra that D.T. was a problem child. Ybarra said that D.T. was the only child abused and that she was "scapegoated" by the Trevinos, meaning she was blamed for things such as problems in their marriage or with the other children. During some visits, Juan was "very aggressive towards [D.T.] blaming her for having the children removed."

Dr. Jeffrey Alvis works at Children's Hospital in Austin. He testified that C.A.T. was admitted to the hospital for a scalp hematoma and a skull fracture. Dr. Alvis said the Trevinos told him that C.A.T. was in a babysitter's care when she was injured and that she might have fallen into a coffee table. Dr. Alvis said he was concerned by that explanation because, "[g]enerally, in cases where skull fractures or other fractures in children are observed, without any adequate explanation, we have to be concerned." Dr. Alvis said the fracture could have been caused by a fall or by another person, but without a "good honest history from the parents," he could not tell the actual cause or time of injury. After C.A.T. stayed overnight in the hospital and with the Department's approval, the hospital discharged C.A.T. into Virginia's care. The hospital was instructed that Juan was not to be around C.A.T. and would have to move out of the house. Dr. Alvis said no other old or healing fractures were found on C.A.T.

Bertha Hights testified that she babysat C.A.T. and never let C.A.T. out of her sight.[2] When Hights last babysat for C.A.T., she did not see C.A.T. fall or hit her head on anything, did not hear her cry out in pain, and did not notice any injury to her head. Hights recalled that the Trevinos called and asked if she knew how C.A.T. got hurt; Juan did most of the talking. Hights told Juan she

---

[2] Hights testified that she last babysat C.A.T. on the Tuesday before Friday, November 6, 1998, when her injury was discovered. However, other testimony indicated Hights babysat for C.A.T. that Friday.

6

did not know anything about it. Hights testified that Juan told her to tell the Department that C.A.T. might have hurt herself falling on a radio in Hights' house. She also testified that Juan approached her at church later and told her, "I was coming to let you know that the baby didn't fall at your house. The baby fell at my house, because I was outside working on my van. And my little boy came out and told me that the baby had fell."

Denise Castaneda Ramirez, former Department investigator, testified that she became involved with the Trevinos on November 10, 1998, when Children's Hospital reported C.A.T.'s injury. When Ramirez spoke to Virginia away from Juan, Virginia was upset and concerned because she did not want to lose her children again. Ramirez said Virginia "even went as far as to say that she didn't think the father did this, but she did not – she wasn't there. And if she had to leave her husband she would, because she did not want to risk losing her children." After interviewing Juan, Virginia, and the other children, Ramirez had no logical explanation for how C.A.T. was injured. Ramirez said she gathered from Juan's statement that "[t]he only person that had unsupervised access . . . from the time that the child could have sustained the injury was Mr. Trevino." Therefore, that night in the hospital Ramirez had Juan and Virginia sign the first safety plan limiting his access to the children. Juan was required to move out of the family house and was forbidden from having any contact with the children.

Ten days after C.A.T. was admitted to Children's Hospital, Ramirez again talked to Juan, who offered new explanations for C.A.T.'s injury. Juan now blamed the other children for C.A.T.'s injury. First, he said their son told Virginia that A.T. had pushed C.A.T. into a wall. Then he said that on the day C.A.T. was injured, the son told him A.T. had pushed C.A.T. He said he had

7

not reported this earlier because he was depressed. Juan also told Ramirez that in 1994 D.T. had bruised herself by falling off a bunk bed. On November 24, Juan and Virginia signed a new safety plan specifying that Virginia would supervise all contact between Juan and the children.

Ramirez said Virginia was initially cooperative and very protective of the children. As time went on, however, Ramirez became concerned as Virginia began to minimize the incident and stated that she did not believe that Juan had hurt C.A.T.

Ramirez interviewed Hights, and according to Ramirez's notes, Hights said that she babysat C.A.T. on Friday, November 6, and that C.A.T. "could have bumped her head on the floor or table, but that [Hights] did not see this happen." Hights told Ramirez C.A.T. was not fussy on Friday, but "maybe it was possible that the child hit something or fell and just did not cry."

Len Snyder, a police officer in Lockhart, testified that sometime in November 1998, Juan approached him to discuss the Department's demands that he leave his house. Juan told Snyder C.A.T. had suffered a head injury but Juan did not know how the injury occurred. Juan said if he did not leave the house, the children would be removed. Snyder testified that Juan told him that Juan "was going to take his clothes out of the residence and . . . put them in his car . . . [and] sleep in the car to make it look like he wasn't at the residence."

Donald Cagle, who was eighteen at time of trial, worked with Virginia for about three months in 1999 and lived in the Trevino home for about a month and a half when he ran away from foster care. During that time, Cagle said Juan stayed at the house as often as Cagle did. Cagle said, "They [Juan and Virginia] made many comments that they weren't supposed to be there. They were very sneaky." Cagle testified that he only heard Virginia tell Juan to leave the house once. Virginia

8

and J.L. were teasing Juan, who suddenly turned on Virginia as if he was going to hit her. Cagle told Juan to stop and Virginia told Juan that if he could not take a joke, he should leave. Cagle testified that there were many times when Juan spent unsupervised time with Virginia's older daughter, J.L. On several occasions, the police came to the house and Juan hid in J.L.'s room or in a closet. Cagle said Juan's worker's compensation claims were fraudulent, that he was not hurt and was capable of lifting heavy objects. Cagle said he thought Juan was a con man. Cagle also testified that Juan bragged to him about his sexual relationships with women other than Virginia, including a sixteen-year-old neighbor. Cagle admitted that he had been angry at the Trevinos, but denied that he was testifying against them for revenge.

Juan testified about his discovery of C.A.T.'s injury. He said when he picked her up from Hights' house on Friday, November 6, she was not crying and he did not notice anything wrong with her. Juan said he became aware of C.A.T.'s injury between about 6:00 and 7:00 that night when J.L. told him that C.A.T. "had a soft spot on her head." Juan testified that the children were alone inside the house for about an hour that night while he was outside working on his car with a friend, but that he supervised them through a window and "never left their sight just about." Juan said he had a good view of the room where C.A.T. was in her playpen.

Juan said he did not take C.A.T. to the hospital immediately because he did not have transportation and he did not think she had a serious injury. He waited for Virginia to get home and they brought C.A.T. to a Luling hospital about 9:00 p.m. The hospital sent them home that night and they returned the next day but were again sent home. On Sunday, November 9, Juan and Virginia brought C.A.T. to Children's Hospital in Austin, where they learned she had a skull fracture.

9

Juan admitted signing the Department safety plans requiring him to move out and have no unsupervised contact with the children. Juan said he knew that his failure to comply could lead to further Department involvement. Juan did not recall telling Snyder that he intended to mislead the Department into thinking he had moved out of the house. Juan said he never took care of the children while Virginia was at work, but admitted to being in the house when she was not home. Juan also admitted being with J.L. in violation of a court order. Juan denied asking Hights to say C.A.T. had fallen while in her care and denied telling her C.A.T. was not injured at her house. He said D.T., Hights, Cagle, and another witness had not testified truthfully.

Gwen Lopez, a Department caseworker, testified her family preservation plan with the Trevinos consisted of therapy, parenting classes, and home visits. Lopez had more contact with Virginia than with Juan, partly because he was not always at the home when Lopez visited. In April 1999, Lopez investigated whether Juan was there when Virginia was not present, making numerous calls to the home. Lopez said that after someone repeatedly picked up and hung up the telephone without speaking, she went to the house. No one answered the door, but someone peeked out the window. Lopez waited until Virginia returned, but Virginia would not let Lopez enter the house. After Lopez called the police, Virginia admitted Lopez. Lopez interviewed the neighbors and the next day decided the children should be removed because she believed the safety plan excluding Juan had been violated.

Ellen Guckian, a parent educator for the Lockhart schools, testified that initially the Trevinos participated in her group meetings only sporadically, often arriving late. She said that later they became more cooperative and attended more regularly. Guckian made several home visits.

10

During one visit, Virginia was on the phone during most of the time and appeared uninterested in talking with Guckian. Juan was attentive to the children. Guckian said she did not have a great deal of experience observing the Trevinos, but she thought Virginia was not very engaged with the children. Guckian said the Trevinos never accepted that they had any responsibility for the Department's involvement with the family and often complained about the Department.

Mary Van Diggele, a court appointed special advocate and guardian ad litem for the children, testified that she had been involved with the case since late June 1999. Van Diggele witnessed several meetings between the children and the parents after the children were in foster care. She said initially the children were "clingy" with Juan and Virginia, but that they no longer seemed traumatized when the visits were over. J.L. acted like a mother to the younger children and Virginia "was rather disassociated from interaction with her children. She more or less sat back and watched. And [J.L.] assumed, to a certain extent, the mothering role." Van Diggele has observed the children in their foster home. She said they were outgoing and interacting normally and did not seem withdrawn or sad. The children played outside and had friends in the neighborhood. C.A.T. is fearless and "intent on discovering her world at top speed." She is normal in all aspects except for speech, and is undergoing speech therapy. Van Diggele said the two youngest children view their foster family as their real parents. Van Diggele said the Trevinos consistently blame A.T. for C.A.T.'s injury. Based on her observations of the children and their interactions with each other, their foster parents, and Juan and Virginia, Van Diggele recommended that Juan and Virginia's rights be terminated.

11

Pastor Benjamin Smith testified that Juan and Virginia had been members of First Baptist Church in Lockhart for almost two years. On occasion, Virginia asked Smith to watch J.L. Smith said Virginia deals with J.L. in a typical mother/daughter way and he believes Virginia is capable of caring for and protecting her children. He did, however, say there was room for improvement in Virginia's discipline.

Taylor Skaar, a counselor with a women's shelter, testified about her work with Virginia since October 1999. Skaar said one of Virginia's major issues was her anger toward the Department and a former therapist. Skaar watched Virginia interact with a Department caseworker and said the caseworker was unprofessional. Skaar believed Virginia's anger toward the Department was justified and said Virginia had made considerable progress in dealing with that anger. Skaar said she had never seen anyone more committed to complying with Department requirements than Virginia. As far as Skaar knew, Virginia attended all classes or events required of her. Skaar believed Virginia was capable of protecting her children, was "psychologically sound enough to provide good mothering," and had "expressed deep caring for her children." Skaar did not believe Virginia was co-dependent on Juan.

Stanley Harlan provided family counseling to the Trevinos at the Department's request from February through October 1999. Harlan testified that Virginia was depressed; he believed she had a long-term depressive disorder stemming from low self-esteem and a sense of worthlessness. He said the Trevino family was very engaged in the counseling, and Virginia was cooperative even though she disliked being required to undergo therapy. Harlan said initially Virginia seemed to have some ambivalence about Juan's involvement in C.A.T.'s injury. She did not think he had hurt the

12

child, but was open to the possibility that he might have. Harlan said Virginia was very angry and dissatisfied with the Department's handling of the family's case. Harlan thought Virginia would be minimally functional and able to care for the children. At the time Harlan stopped seeing Virginia, she was still depressed but had made progress in being less reliant on Juan. Virginia told Harlan that she missed Juan but indicated that she was complying with the Department's requirements. Harlan believed Juan and Virginia were co-dependent on each other. In April 1999, Harlan called the Trevino home to speak to Virginia. Juan answered and said he was watching the children while Virginia made a trip to work. Harlan then reported a possible safety plan violation to the Department, as required by his contract.

Minnie Mae Hudspeth babysat the Trevino children for about three months at the end of 1998. She said Juan never picked up the children and the children were always in good condition. Hudspeth said the children were glad to see Virginia when she picked them up and she was affectionate with them. Cindy Gray Tidwell educated Virginia about nutrition, child care, and stress management for about six months and testified that Virginia was cooperative and seemed to assimilate information from the training. Maria Revas babysat for C.A.T. for about three months up until April 1999 and testified that C.A.T. always appeared healthy, well fed, cared-for, and happy to see Virginia. Revas also testified that she had observed the entire family together before November 1998, and that they were happy.

Virginia's oldest daughter, J.L., testified that although Juan was not her biological father, she called him "dad." J.L. denied that she had been alone in the house with Juan on the day before the Department removed the children. She said her grandmother had been there. When asked

13

if she knew whether Juan was also there, she answered, "No, ma'am." J.L. said Juan never came to the home when Virginia was not there. She testified that she was not afraid of Juan, he had never hurt her, and she had never seen him hurt any of the other children.

Virginia testified that she loved her children. She said they were a normal but not perfect family, and she never hurt the children or saw Juan hurt them. Virginia said when she arrived home from a week-long training session on November 6, Juan immediately asked her to look at C.A.T.'s head. She felt a soft spot and asked her sister to drive them to the Luling hospital. The hospital sent them home and the next day Virginia went to work. When she got home that evening, C.A.T. seemed fine. She worked all the next day, leaving instructions with Juan that if C.A.T. worsened he should call Virginia immediately. When she got home about 10:00 p.m., she decided to bring C.A.T. back to the Luling hospital to ask for a CAT scan. The hospital did the scan but "didn't know what to do with" C.A.T., so the Trevinos went home again. On Monday, Virginia again had to work, and when she got home she asked her sister to drive them to Children's Hospital in Austin. Virginia said Juan took C.A.T. to see two other doctors during this time frame.

Virginia denied allowing Juan to be with the children when she was not present and denied leaving them with him the day before they were removed. She said that day she worked until about 2:00 p.m., picked up C.A.T. from the babysitter, and went home to make dinner and wait for the other children to get home from school; her mother was visiting at the time. After dinner, Virginia left her mother with the children and left to run an errand. Juan, who still had a key to the house, was not there when she left but came while she was gone. When Virginia returned, Gwen Lopez was waiting outside. Virginia said she refused to allow Lopez into the home because her

14

attorney had instructed her not to speak to the Department. When Lopez called the police and insisted on entering the home, Virginia allowed her inside. The next day, the Department removed the children.

Virginia testified that she had complied with all of the Department's requirements, including attending parenting classes, Alcoholics Anonymous meetings, and anger management therapy. Virginia testified that she tried to reschedule two classes she missed due to conflicts with a doctor's appointment and a job interview, but her caseworker refused. Virginia said she never saw Juan hit D.T. with a stick, although she did see him hit her leg with a fly swatter. Virginia said she had not filed for divorce or stopped seeing Juan because she loves him; she did not believe Juan had injured C.A.T. However, she agreed that if only Juan's parental rights were terminated, she would move away where Juan could not find her. Virginia testified that A.T. told a doctor that C.A.T. was hurt when A.T. and J.T. were playing, but a Department caseworker told A.T. to stop lying.

There was additional conflicting testimony about whether the Trevinos allowed J.L. to socialize very late at night with a much older girl and whether Juan provided alcohol and pornography to Donald Cagle when Cagle was a minor.

## DISCUSSION

Juan argues that the Department did not prove how C.A.T.'s injury occurred and that such a showing was necessary because of the dissimilarity between C.A.T.'s and D.T.'s injuries. He argues that the "[D.T.] factor" must be removed from consideration and the case evaluated as a "straightforward accidental injury to a child case with no aggravating facts." Virginia argues that the record contains no evidence that she or the children's environment endangered the children and that

15

"no one actually testified that they would be concerned for the children's safety" if they were returned to Virginia's care. Virginia also argues that the "relevant time frame" was before the children were removed and because K.T. was removed immediately after she was born, there was no evidence to support the termination of Virginia's rights as to this youngest child.

Both Virginia and Juan downplay the evidence supporting termination. They ignore the conflicting evidence as to whether Juan was frequently alone with the children in violation of the safety plan, and whether Juan told other people that he intended to deceive the Department. They also overlook testimony from experienced Department personnel who expressed concern for the children's well-being if left in the Trevinos' care, and Cagle's testimony that Juan violated the safety order with Virginia's knowledge and involvement, fraudulently obtained worker's compensation, and had a sexual relationship with a sixteen-year-old neighbor.

D.T. testified that Juan once banged her head on the floor until she passed out. C.A.T. also suffered head injury, the cause of which has not been satisfactorily explained. Over time, Juan offered changing explanations of how the injury might have occurred and there was evidence that he attempted to convince C.A.T.'s babysitter to take the blame for the injury. Department personnel testified that Juan had been slow to accept responsibility for D.T.'s earlier injuries. The children's guardian ad litem testified that the children were flourishing in foster care and recommended that the Trevinos' rights be terminated. There was conflicting testimony as to whether the Trevinos followed through with education to improve their parenting skills.

This is a close case. While there is evidence that the Trevinos are competent or "good enough" parents, there is also sufficient evidence to the contrary. The evidence and inferences that

16

may be drawn from that evidence are sufficient to show that Juan endangered the children by his own conduct. Likewise, the evidence is sufficient to show Virginia should have been aware that it was unsafe to place her children in Juan's care or to allow him to be in the home with them. That Virginia continued to be involved with Juan throughout these proceedings and refused to accept the likelihood that Juan seriously injured C.A.T. indicates that she might in the future fail to take steps to protect the children. Virginia's argument that there was no evidence to support termination of her relationship with K.T. fails because it is not necessary for the injuring conduct to be directed at K.T. to terminate the parent-child relationship. *See Boyd*, 727 S.W.2d at 533; *Leal*, 25 S.W.3d at 325.

Considering the conflicting evidence and leaving matters of credibility and demeanor to the jury's determination, as we must, we cannot hold that the jury's findings that the Trevinos' parental rights should be terminated are so against the great weight and preponderance of the evidence as to be clearly unjust. *See Leal*, 25 S.W.3d at 325. Likewise, taking into account factors such as the children's needs, present and future dangers posed by the home environment, the Trevinos' parenting abilities and programs available to them, and their acts or omissions directed at the children, we cannot hold the finding that termination is in the children's best interests to be unsupported by the evidence. *See D.O.*, 851 S.W.2d at 355-56. We hold there is clear and convincing evidence sufficient to support termination under sections 161.001(1)(D) or (E) and to support a finding that such termination is in the children's best interests. *See Leal*, 25 S.W.3d at 325. We overrule Virginia's second and third points of error and Juan's third issue.

17

Having found sufficient evidence to support termination under sections 161.001(1)(D) or (E), we need not address the Trevinos' attacks on section 161.001(1)(O). *See In re M.C.M.*, 57 S.W.3d at 32.

## MISTRIAL

Virginia also contends the district court erred in refusing her requests for a mistrial due to questions asked about Juan's friend Oscar Doria, Doria's conviction for indecency with a child, and the possible adoption of the children. Initially, we note that although Virginia contends that the Department "violated the limine regarding Oscar Doria on more than one occasion," and "went beyond the Court's ruling on the Motion in Limine in asking whether the children were adoptable," a review of the motion shows that neither subject was barred by the district court's order in limine. Nowhere does the motion refer to Doria by name, and none of the limits set forth in the motion apply to his conviction for indecency with a child. Further, the district court *denied* Virginia's request to include in the motion in limine "[a]ny testimony of the proposed adoption of the children." We will review whether the district court should have granted Virginia's motions for a mistrial apart from motion in limine considerations.

Juan testified that Doria was a friend of his. The Department asked whether Doria was in prison, and Juan said he did not know. Virginia objected that the question was irrelevant, and the district court overruled her objection. Doria's name came up again, and the Department asked:

A:        Did you know that Oscar Doria was convicted of indecency —

Juan:    Objection, Your Honor.

18

Q:   — with a child?

The Court: Sustained.  I'll ask the jury to disregard that last comment.

Finally, the Department asked Denise Ramirez who else was at Children's Hospital when she interviewed Virginia.  Ramirez answered, "Well, Mrs. Virginia Trevino arrived with Oscar Doria and his wife."  Virginia moved for a mistrial, arguing that the Department kept bringing up Doria in an attempt to taint the jury.  The district court denied the motion, but admonished the Department not to mention Doria again:  "I'm just informing counsel that if it keeps coming up after we've got the stink in the jury, I'm going to be considering a mistrial."

As for testimony regarding the children's adoption, Stephanie Hofferek, a Department supervisor, was asked about the Department's plans for the children should the Trevinos' rights be terminated.  Hofferek stated that the Department intended for the children to be adopted.  When asked, she testified that the children were adoptable; Virginia objected immediately after Hofferek's answer and the district court sustained the objection.  When the Department asked Hofferek whether the Department would attempt to keep the children together, Virginia objected and the district court sustained her objection.  Virginia moved for a mistrial, saying

> The Court's ruling on the Motion in Limine was that they could ask what the plans were.  The answer was supposed to be adoption and move on.  Not go into the details.  The [Department] has crossed and violated that order forcing me to object in front of the jury and also forcing — allowing the jury to hear that their opinion was that these children are adoptable.  Now, we've opened this whole can of worms and these children may not be adoptable.

The district court overruled Virginia's request for a mistrial.

19

A trial court's decision on a motion for mistrial is reviewed for an abuse of discretion. *Van Allen v. Blackledge*, 35 S.W.3d 61, 63 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *Pitman v. Lightfoot*, 937 S.W.2d 496, 537 (Tex. App.—San Antonio 1996, writ denied). A trial court abuses its discretion when it acts unreasonably or arbitrarily, without reference to any guiding principles. *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991).

Virginia complains of three questions asked during a week-long trial with more than twenty-five witnesses. The district court sustained Virginia's objections and instructed the jury not to consider the question regarding Doria's conviction for indecency with a child. A trial court has the discretion to so admonish the jury in lieu of declaring a mistrial, and here the admonishment cured any possible error in the asking of the question. *See Weidner v. Sanchez*, 14 S.W.3d 353, 365 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Based on this record, we cannot hold that the district court abused its discretion in refusing to grant Virginia a mistrial. We overrule Virginia's fourth point of error and affirm the decree of termination.

_____

Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

Affirmed

Filed: January 10, 2002

Do Not Publish