# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00098-CV

**Kathy A. Preece, Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF MCCULLOCH COUNTY, 198TH JUDICIAL DISTRICT
### NO. 2004113, HONORABLE EMIL KARL PROHL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

After a bench trial, the trial court found that appellant Kathy A. Preece's parental rights to her child A.L.M. should be terminated.[1]  Preece appeals, arguing that the evidence is legally and factually insufficient to support a finding that termination is in the child's best interest.  She contends that termination was not in A.L.M.'s best interest because A.L.M. and her attorney ad litem opposed termination, her foster father has a criminal record,[2] and Preece proposed an alternative placement with one of A.L.M.'s half-sisters.  We affirm the trial court's order.

---

[1] The parental rights of Marshall Morris, A.L.M.'s father, were also terminated.  Morris has not appealed from the termination of his rights.

[2] Preece states that "the foster father is a convicted felon," pointing to testimony in which Marshall Morris, A.L.M.'s father, was asked if he had "found out that CPS actually placed [A.L.M.] with a convicted felon."  The Department objected to that question as hearsay and assuming facts not in evidence, and the trial court sustained the objection.  Morris said that he did not personally know anything about the foster father "except that he's the foster father of my daughter."  He did not believe the foster parents were an appropriate placement for A.L.M., but said it was "[j]ust based on their appearance.  I don't know anything about either one of them personally."

## Factual Summary

In September 2004, the Texas Department of Family and Protective Services filed its original petition seeking conservatorship of A.L.M., who was born in April 1999. The Department attached an affidavit in which Susan Neal, a Department caseworker, alleged that the Department received a report in July 2004 that A.L.M.'s father, Marshall Morris, had failed to return the child after a visit and said that he would shoot A.L.M. and himself if anyone tried to take her from him. Both Morris and Preece were alleged to be using methamphetamine, and Preece was alleged to be without a home or means of support. The Department spoke to the parents, and Morris denied making any threats. Both parents agreed to a safety plan under which A.L.M. was placed with her maternal grandmother, Mary Louise Parker. The parents also agreed to work with the Department on resolving issues involving substance abuse, anger, and child custody. Preece moved in with A.L.M. and Parker in August 2004, but was admitted to the Kerrville State Hospital on August 17; she was released on September 4 and was diagnosed with major depressive disorder "recurrent with psychotic features," substance dependence, and hypertension. After her release, she lived in a tent and with various relatives. On September 19, Morris, Preece, and Parker got into a disagreement about A.L.M.'s care. The police were called, and the police called the Department, and Parker said she could "no longer deal with the situation." Preece and Morris told the Department that Parker had allowed another of her daughters to care for A.L.M., and that the other daughter used drugs around A.L.M. Neal averred that the parents were unstable and fought in front of A.L.M., causing her emotional stress.

Neal testified at trial that Preece and her family called the Department to report that Morris had threatened to shoot A.L.M. and himself if anyone tried to take A.L.M. from him. Morris denied making any such threat and agreed to bring A.L.M. to a Department office; when he arrived, he declined to take a drug test, saying he would test positive for marijuana. The Department found that Morris had six arrests related to drug abuse and that Preece had four, and Morris told Neal that Preece was using methamphetamine. A.L.M., who was five at the time, was placed with her maternal grandmother, where she remained until September 2004, when Parker was no longer willing to be involved with the situation. Parker reported to the Department that both parents were still using drugs. Neal heard an audiotape of a phone call Preece made to Morris. Neal said "it was Kathy Preece calling and cussing [Morris] out and threatening to burn his house down, and, of course, we could hear the child, [A.L.M.], screaming in the background, so she was hearing all this." Shortly after this, the Department removed A.L.M. from Parker's care and placed her in foster care.

Linda Keys, another Department caseworker assigned to this case, testified that she had seen Morris "on several occasions" get angry and "very out of control. He'll yell. He'll scream. He'll curse. He'll threaten." Preece repeatedly told Keys that she was afraid of Morris, that Morris was physically violent towards her, and that she had concerns about A.L.M. being around Morris, but then Preece "would completely deny that. Very unrealistic in her manner of understanding safety and protection." Keys said that when Preece and Morris were together, they said they were happy and that there were no conflicts, but when they were separated, they would both "almost tattle on each other," relating tales of infidelity, drug use, and stalking. The Department put Preece in touch with a drug counselor, but she eventually stopped attending those appointments altogether. Keys

3

said Preece "is not a real stable person. I believe that she has mental health issues that are currently being addressed. She has illegal drug use issues that are not being addressed. I believe she also has a problem with alcohol. She has a medical condition, Hepatitis C, that I don't think she's getting any treatment for." Keys was also concerned because Preece had refused for several months to take any drug tests, even though it meant she could not have visitation with A.L.M.

Keys testified that A.L.M. has hepatitis C and that currently there is no treatment for children with hepatitis C. However, A.L.M. had been tentatively accepted into a medical study in Fort Worth for a childhood hepatitis treatment; if either of her parents has custody, she probably will not be accepted into the program. Morris told Keys that he had not seen proof that A.L.M. had hepatitis and he did not want her to be "cut open" for the study. At one point, Morris got angry and said, "Why do you even test children for Hepatitis C? [A.L.M.] shouldn't have been tested." Keys was "astounded" by Morris's reaction and testified that after Preece disclosed that she had hepatitis, it was standard protocol to immediately test A.L.M.

Keys testified that A.L.M.'s foster parents have expressed an interest in adopting her. Keys said A.L.M. had a "very close relationship" and was "very bonded" with her foster family. At trial, a question was raised for the first time as to whether A.L.M.'s foster father had a criminal record. There was evidence that when he was nineteen or twenty years old, about fifteen years earlier, he took some money from the cash register where he worked; he was charged with theft and repaid what he had taken. Keys discussed the situation with her supervisor and stated that, if it was shown that it had "been properly rectified[,] . . . it would not be something that would prevent a foster parent from being licensed." Keys testified that although A.L.M., who was six years old at

4

the time of trial, loves her parents and would like to live with them again, she also knows that they have drug problems and has been afraid living with them. A.L.M. was happy and "thriving" in her foster home, and Keys said termination was in A.L.M.'s best interest because she "has so much anxiety and so much hyper-awareness, and she needs a chance to be in a stable home soon."

Asked whether it would be appropriate to place A.L.M. with Tandus Rizos, one of Morris's older daughters, and Rizos's husband and children, as advocated by Preece and Morris, Keys said a home study showed that although Rizos was a responsible and good parent to her own children, she and her husband were planning to move and there was "a lot of instability." Further, Rizos has hepatitis A or B, but has not had any medical examinations in several years. Finally, Rizos did not get along with Preece, who made her feel "threatened," and the Department worried that she would not be willing or able to keep A.L.M. away from Morris.

Tandus Rizos was twenty-seven at time of trial, had been married for ten years, and had two children. She testified that she was willing to take care of A.L.M., as her father requested, and said she and her husband had just moved and rented a house near Houston. Rizos said that she had hepatitis B when she was eleven years old, but had undergone treatment and no longer had it. Rizos last saw A.L.M. in July 2005 and said A.L.M. was "pretty excited to see" her. She said she had a close relationship with Morris and talked to him every day. Rizos said that if she believed Morris was using drugs, she would keep him away from A.L.M. and that she would abide by a court order barring him from seeing A.L.M. However, Rizos did not believe Morris was using drugs currently or had a problem with drug addiction.

The Department's home study stated that Rizos knew her father had a history of domestic violence and drug abuse, but did not "seem to grasp the severity and the extent of the problem, almost as if she does not want to admit to herself that her father is an addict." The home study concluded that A.L.M. should not be placed with Rizos because A.L.M. was "well attached and bonded" to her foster parents and "[p]lacement in the Rizos' home could be detrimental to the progress" A.L.M. had made because A.L.M. was unfamiliar with Rizos's home and her contact with Rizos and her family has been minimal. The Department noted that the Rizoses had their own business and, therefore, a fluctuating income, and lacked consistent medical insurance. Further, Rizos was in close contact with Morris and there are no restrictions on his contact with Rizos's children, "[t]herefore he would have contact, communication, and access with" A.L.M. in Rizos's home. The Department believed that Rizos and her husband "seem to be minimizing the severity of [A.L.M.'s] medical condition," did not "comprehend the seriousness of the disease [or] the extent and length of involvement necessary" for A.L.M. to participate in the Fort Worth medical study, and did not seem to want to travel to Fort Worth "if there are hospitals here." The Department had concerns "as to how Mrs. Rizos would protect [A.L.M.] from her father and possibly her mother."

Melodee Huggins, A.L.M.'s counselor, testified that if A.L.M. were sent to live in Houston with Rizos, "it would be devastating for her to be taken from the foster parents that she's currently with because she is very bonded with them." Huggins recently recommended that Morris's visits with A.L.M. be stopped because A.L.M. had come to believe that she would be going to live with him soon and that he was doing what he needed to do to regain custody. After her parents miss visitations, A.L.M. acts out, and she recently had been "lying and stealing" after a visit fell through.

6

Huggin said that although A.L.M. wants to have a relationship with her parents, Huggins believed it was in A.L.M.'s best interest "to let her move on with her life." She said A.L.M. "knows that when she gets to be an adult, . . . she can go back and she can find them."

Morris admitted that he had used marijuana and methamphetamine in the past, sometimes in A.L.M.'s presence, but denied using drugs since July 2004. Morris took a drug test during trial, which came back positive for methamphetamine, but he denied using methamphetamine since July 2004 and said he did not know why the test showed a false positive. He denied threatening to shoot A.L.M. and himself and said that although he once brandished a gun during a fight, it was not loaded. In January 2005, he was arrested for assaulting Preece in the parking lot after an Alcoholics Anonymous meeting, but in February he and Preece reunited. At the time of trial, they had been separated for nine or ten months, but they were still on friendly terms.

Preece testified that she was living in her mother's home, but that her home was not suitable for A.L.M. Preece wanted A.L.M. to be placed with Morris and if that was not possible, with Rizos. Preece said she lied when she told the police that Morris had threatened to shoot A.L.M., saying that she took her brother-in-law's word for it and later found out it was not true. She also said that a second incident in which she told the police that Morris had threatened to shoot her was not true and based on a lie told to her by her brother-in-law. Preece testified that she had refused to take the last several drug tests requested by the Department, but said she stopped using drugs in July 2004. A more recent drug test gave a positive result for methamphetamine, but she denied using drugs and said she was told by her doctor that the prescription drugs she was taking could have led to that result.

7

A.L.M.'s attorney ad litem stated that his position was that "the parents' rights not be terminated at this time, but the Department remain the managing conservator, and that she would remain in foster care which would allow for a future modification" if either Preece or Morris "get their lives back together." A.L.M.'s court-appointed representative recommended that the parents' rights be terminated and that A.L.M. be placed for adoption.

**Discussion**

A parent's rights to her children may be terminated only if the Department proves and the trial court finds by clear and convincing evidence (1) that the parent has engaged in conduct set out as statutory grounds for termination, and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001 (West Supp. 2005); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). Evidence is clear and convincing if it produces in the fact-finder's mind "a firm belief or conviction as to the truth of the State's allegations" supporting termination. *C.H.*, 89 S.W.3d at 25. In reviewing the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the finding and ask whether a reasonable trier of fact could have formed a firm belief or conviction as to the truth of the finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We review the factual sufficiency of the evidence by viewing all of the evidence and asking whether a reasonable fact-finder could have resolved disputed evidence in favor of its finding. *Id.* If a reasonable fact-finder could have resolved any evidentiary disputes so as to form a firm belief as to the truth of the State's allegations, the evidence is factually sufficient. *Id.*; *C.H.*, 89 S.W.3d at 25. We must maintain appropriate deference to the trial court's role as fact-finder by assuming that it resolved

evidentiary conflicts in favor of its finding when reasonable to do so and by disregarding evidence that it could have disbelieved. *J.F.C.*, 96 S.W.3d at 266-67.

Some of the factors we consider in determining a child's best interests are: the child's wishes; her emotional and physical needs now and in the future; emotional or physical danger to the child now and in the future; the parenting abilities of the parties seeking custody; programs available to help those parties; plans for the child by the parties seeking custody; the stability of the proposed placement; the parent's conduct indicating that the parent-child relationship is improper; and any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). Permanence is a "compelling consideration" in evaluating a child's present and future needs. *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied); *see Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502, 513 (1982) (children need stable, long-term relationships with caretakers). A fact-finder may compare the parent's and the Department's plans for a child and may consider the possible consequences of a decision not to terminate. *See D.O. v. Texas Dep't of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ).

Although there was evidence that A.L.M. loved her parents and hoped to return to their care, A.L.M. was six years old at the time of trial and even at that age recognized that her parents had drug abuse problems. She was present during fights between her parents and could be heard screaming in the background of one abusive and threatening call made to Morris by Preece. Rizos testified that she wanted and was able to care for A.L.M. and that she would protect A.L.M. from her parents if she was ordered to do so. However, the Department recommended against that placement because of concerns that Rizos would not exclude A.L.M.'s parents from contact with her,

9

did not recognize the severity of A.L.M.'s medical condition and did not seem willing to make a drive to Fort Worth to obtain medical treatment, and lacked consistent health insurance. Further, A.L.M. was unfamiliar with Rizos and her family, and the Department believed it would hurt her progress to uproot her from her stable foster home. The Department intended to keep A.L.M. with her foster parents, who might be willing to adopt her. A.L.M. had thrived in that placement and had bonded with her foster parents, and she was tentatively accepted into a medical study through which she could get a new treatment for hepatitis C. Neither Morris, Preece, nor Rizos seemed to comprehend the severity of A.L.M.'s hepatitis, and both Morris and Preece recently tested positive for methamphetamine but denied using the drug. Preece had refused to take any drug tests for several months before trial even though that refusal meant she did not get to visit A.L.M. Preece had stopped seeing her drug counselor and the Department did not believe she was mentally stable. She had a pattern of reuniting and breaking up with Morris, who could get "out of control" when angry, and she would accuse him of physically abusing her and then recant her allegations. Although there was evidence that A.L.M.'s foster father might have a criminal record from about fifteen years earlier, the Department looked into it and did not believe that the charge, if disposed of, would bar him from being a foster parent.

None of the professionals assigned to A.L.M.'s case opined that she should be placed with Rizos. A.L.M., a six-year-old child, wished to be reunited with her parents some day, and her attorney ad litem asked that she be left in her current placement with a possibility for reunification in the future. However, the Department's caseworkers, her counselor, and her court-appointed representative all believed termination and adoption was in her best interest. Based on this record,

and considering A.L.M.'s medical condition, the stability and bonding of her foster placement, Preece's mental instability and substance abuse problem, the Department's concerns about a placement with Rizos and her family, and Preece's refusal to undergo further drug testing at the expense of her visitation with A.L.M., we hold that the evidence is both legally and factually sufficient to support a finding that termination is in A.L.M.'s best interest. We overrule Preece's sole issue on appeal and affirm the trial court's order of termination.

 

 

_____

David Puryear, Justice

Before Chief Justice Law, Justices Puryear and Waldrop

Affirmed

Filed: August 30, 2006