# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00327-CV

**Aimee Anderson, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
NO. 209-029-B, HONORABLE RICK MORRIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

After the Texas Department of Family and Protective Services sought to terminate appellant Aimee Anderson's parental rights, a jury found that her rights should be terminated, and the trial court entered a decree to that effect. Anderson contends that the evidence is insufficient to support a finding that termination is in the children's best interest. We affirm the termination decree.

### Factual Summary

Anderson is the mother of J.A., born in June 2002, and A.M., born in December 2004. At the time of trial in May 2006, she was twenty-five years old. On February 25, 2005, a Department caseworker, accompanied by two police officers, responded to a referral and went to the residence

of Anderson and Valentino Morales, A.M.'s father and Anderson's common-law husband,[1] to check on the welfare of J.A. and A.M. When the caseworker and the officers arrived, the children were not there but were with their babysitter, Alice Wooley. Anderson contacted Wooley, who brought the children home. The police officers testified that J.A. and A.M. appeared clean and healthy. The caseworker and the police questioned Anderson and Morales, and Anderson admitted she had used methamphetamine the day before and submitted to a drug test. During the interview, J.A. produced a dollar bill that concealed a small bag of methamphetamine. The police then searched the residence and found additional methamphetamine, drug paraphernalia, $1,369 in cash, and a notebook detailing a large number of drug transactions. Anderson testified that Morales sold drugs and that she kept track of his transactions. She said that Morales, who was more than twice her age, was "very dominant" and "had control over anything and everything that [she] did"; a drug-enforcement agent testified that he believed Morales was "more in charge" of the drug dealing.

The children were removed from the home, but Anderson and Morales were not taken into custody. Instead, Morales agreed to act as a confidential informant to help the police apprehend others involved in methamphetamine distribution. In violation of this agreement, however, Morales and Anderson continued to distribute and use drugs. Morales and Anderson were arrested on federal drug charges on April 14, 2005, and Morales was sentenced to twenty years in federal prison. At the time of trial, Anderson had pled guilty and was awaiting sentencing. She testified that her attorney told her she had a chance of being placed on probation, but the drug-enforcement officer testified that Anderson could expect to serve a minimum of ten years and was unlikely to receive probation.

---

[1] Morales's parental rights to A.M. were terminated in the same proceeding, as were the parental rights of J.A.'s father. Neither father is a party to this appeal.

Anderson testified that she first used a form of methamphetamine at age seventeen. Her drug usage remained sporadic until 2004, when it increased to several times a week; she testified that she stopped using while she was pregnant with A.M. She admitted that even after she was confronted by the police and her children were removed from her care, she continued to use drugs. In late May 2005, shortly after being released to await sentencing on the federal charges, Anderson voluntarily checked herself into a ninety-day, in-patient drug rehabilitation program. She received a certificate of completion on August 21, 2005, and at the time of trial, she had received her one-year chip from Narcotics Anonymous, signifying that she had been sober and drug-free for one year.[2] She had ended her relationship with Morales and was engaged to be married to another man, whom she began dating in late November 2005; at the time of trial, her fiancé was in the process of getting a divorce. Anderson testified that although her fiancé was no longer involved in drug use, he had been convicted of drug possession three times—he was first convicted of cocaine possession in about 1992, he served a five-year prison sentence for a second conviction, and then was convicted of marijuana possession in 1998, four months after his release from prison; the marijuana conviction was later "thrown out." Anderson testified that she had fully complied with the Department's service plan. Among other things, she had completed parenting classes, attended counseling, obtained housing, and secured employment. She had made all scheduled visits with her children since their removal, although on occasion, the children were not made available at scheduled visits.

J.A. and A.M. were initially placed with Kiana Kanoa, Morales's daughter and A.M.'s half-sister. Kanoa and her husband returned the children to the Department's care after about

---

[2] In the year before trial and since her release from the rehabilitation program, Anderson had paid for and passed random drug tests administered every one to three weeks.

3

one month, however, because they could not care for the children financially. Kanoa testified that they thought family members could babysit the children, but were later told that the children had to be placed in certified daycare, which costs about $900 a month, and that the Department could not give them any financial assistance. Kanoa said that after the children were returned to the Department, a caseworker told her that daycare had been arranged that would not have cost the Kanoas anything, but that the Kanoas could not retract their decision to give up the children. Kanoa testified that "another issue" that caused her and her husband to return the children to the Department was that Anderson and her father did not provide any of the monetary support they had promised. The Department then placed the children with a foster family, where they have been since April 2005. Kanoa said that after it became apparent that she and her husband could not keep the children, Anderson's father did not contact the Kanoas to say he wanted to take the children.

Anderson testified that if she were sent to prison, she wanted the children placed with her father, Tim Wallace. She initially hoped Kanoa could keep the children because they would be closer to her. She testified that the Department refused to do a home study on Wallace and said she was told that the Department would "only allow one home study for this case" and that she would have to raise $600 to have a study done on her father's home. When the Department noted that Wallace had not filed a plea in intervention until two months before trial, Anderson said Wallace had attended a hearing and spoken to a Department caseworker in April 2005, but had not gotten anywhere; he also attempted to see the children during one visit, but was asked to leave. She agreed when asked by the Department's attorney whether, if her father had filed a petition in intervention a year earlier, shortly after their removal, she and the Department "might not be here" in a termination proceeding, but said, "I didn't say it was the Department's fault. But how am I supposed

4

to have a home study if nobody will order one? How am I suppose[d] to bring my dad in without a home study? I can't." She testified that Wallace had seen J.A. "quite a few times" and had seen A.M. twice, although the second time he spent only a few minutes with her because the Department asked him to leave; the last time he saw both children was more than a year before trial.

Tim Wallace testified that he would take the children if Anderson was sentenced to federal prison. He testified that he and his wife had attempted to inform the Department that they were interested in taking custody of Anderson's children starting in April 2005, when they attended a hearing and spoke to a Department caseworker. They were told that the Department had already done one home study and "that another one would not be done by the State." He testified that shortly before trial, he moved to Kentucky from Houston, and that Anderson and her mother had paid for a home study on Wallace's house in Kentucky. The home study, which was positive about Wallace and his family and was introduced into evidence, was begun in February 2006 and completed in early May, about ten days before trial; the study was delayed by his move and his mother's death. He testified that he attended at least one other hearing, but was not allowed to testify. He said, "Every time I tried to contact [the Department] at the hearing, I ran into a brick wall." Wallace said he had visited with J.A. perhaps four times between the time J.A. was about one-and-a-half years old and when the Department took custody of the children. Asked whether he had considered how it would affect the children to be removed from "the only stable home that they've had," Wallace said, "I believe they're better off with family blood."

The children's foster mother testified that when A.M. entered into her care, her pediatrician diagnosed a failure to thrive, meaning that A.M. was well below normal height and weight standards; after several months in foster care, A.M. reached the 75th percentile on growth

5

charts.[3] The foster mother also testified that J.A. suffers from an attachment disorder, one cause of which is the "absence" of drug-addicted parents. Once a week, the children's foster mother drives J.A. to a specialist more than one hour away for therapy for this disorder. She and her husband testified that they would adopt J.A. and A.M. if their parents' rights were terminated.

Carla Wright, who was appointed as the children's guardian ad litem in December 2005, recommended that Anderson's parental rights be terminated so that J.A. and A.M. could be adopted by their foster parents. She testified that she had "lots of telephone contacts" with Anderson and the foster parents and had observed the foster home once and one visit between Anderson and the children. Wright acknowledged that Anderson had come a long way and appeared to be doing well, but believed termination and adoption were in the children's best interests. She testified that she struggled with her decision, but her concern was that Anderson would be unable to provide permanency for her children due to the pending federal charges; she said, "It's not the children's fault that there's a criminal case pending. And they need some type of permanency in their life." She testified that the children had been with their foster parents for more than a year and were doing "extremely well." Wright said Anderson mentioned her father for placement in January 2006. At that time, Wright was concerned because Wallace was between homes due to his move and because the Department had said they were not going to pay for a second home study. Wright told Anderson at that time that if she and her family wanted a study done on Wallace's home, she and her family would have to pay for it themselves.

---

[3] There was testimony that Anderson and Morales, A.M.'s parents, both have slight builds.

6

Given her success in overcoming addiction, her compliance with the Department's reunification plan, and the assistance offered by Wallace, Anderson argues that the evidence is factually insufficient to support the jury's finding that termination is in the children's best interest.

**Standard of Review**

To terminate an individual's parental rights, Texas law requires a district court to find by clear and convincing evidence that (1) the parent has engaged in one of the statutory grounds for termination, and (2) the termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001 (West Supp. 2006). Anderson does not contest that she engaged in one of the statutory grounds for termination. Therefore, the only question is whether the jury could have found by clear and convincing evidence that terminating Anderson's parental rights is in the best interest of her children.

Texas courts recognize that the natural right "between parents and their children is one of constitutional dimensions." *In re J.W.T.*, 872 S.W.2d 189, 194-95 (Tex. 1994) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). Given the importance of this right, due process requires that the State justify any termination of the parent-child relationship by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *Horvatich v. Texas Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 596 (Tex. App.—Austin 2002, no pet.). Clear and convincing evidence is that degree of proof that produces in the mind of the trier of fact a firm belief or conviction about the truth of the allegations supporting termination. *C.H.*, 89 S.W.3d at 23.

The focus of the best-interest determination is on the child, not on the parent. *See D.O. v. Texas Dep't of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ). However, there is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *Swate v. Swate*, 72 S.W.3d 763, 767 (Tex. App.—Waco 2002, pet. denied). In deciding whether to override this presumption, factors to be considered include: the child's desires; the child's emotional and physical needs now and in the future; the emotional or physical danger to the child now and in the future; the parenting abilities of the individuals seeking custody; the programs available to assist those individuals to promote the child's best interest; the plans for the child by those individuals or the agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). Permanence is of paramount importance in considering a child's present and future needs. *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no pet.); *see In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied); *In re M.A.N.M.*, 75 S.W.3d 73, 99 (Tex. App.—San Antonio 2002, no pet.). Establishing a permanent, stable home for a child is a compelling state interest. *Dupree*, 907 S.W.2d at 87. A trier of fact may compare the parent's and the State's permanency plans in determining the best interest of the child. *See D.O.*, 851 S.W.2d at 358.

In reviewing the factual sufficiency of the evidence, we must defer to the trier of fact's conclusions and "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). If a reasonable trier of fact could have formed a firm belief or conviction to support its finding of termination, then

8

the evidence is factually sufficient. *Id*. We must consider whether the disputed evidence is such that a reasonable trier of fact could not have resolved that evidence in favor of its finding; only if, when viewed in the context of the entire record, "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction," is the evidence factually insufficient. *Id*. In applying these standards of review, "we consider the evidence that supports a deemed finding regarding best interest and the undisputed evidence. We do not consider evidence that a factfinder reasonably could have disbelieved." *Id*. at 268.

## Discussion

This is not an easy case and we are somewhat troubled by its outcome. Anderson has made significant progress in recovering from drug addiction and complying with the court orders in this case. She has most notably achieved and maintained her sobriety. She has also obtained employment and appropriate housing, completed parenting classes and a psychological evaluation, and submitted to and passed randomly administered drug tests. Despite these accomplishments, however, we can only conclude that there is sufficient evidence on which a reasonable trier of fact could have based a finding that termination of Anderson's rights is in the children's best interests.

Anderson has federal drug charges pending against her and, although she hopes to qualify for probation, a federal drug agent testified that she was likely to be sentenced to ten years in prison. Wallace testified that he would take the children in the event Anderson is sentenced to federal prison, but he lives in another state, far from where Anderson would be serving her sentence,

9

he did not file a petition in intervention until shortly before trial, Wallace did not pay for the home study himself, Anderson and her family did not obtain the home study on Wallace until shortly before trial, and Anderson's attorney apparently never called Wallace to testify in earlier hearings.

"While parental rights are of constitutional magnitude, they are not absolute," and it is "essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26. The *Holley* factors are not exhaustive, and not every factor must be shown before parental rights may be terminated. *Id*. at 27. We must "maintain the respective constitutional roles of juries and appellate courts," and may not reverse the trial court's judgment unless a reasonable jury *could not* have formed a firm conviction or belief that terminating Anderson's rights is in the children's best interests. *Id*. at 26-27.

Anderson concedes that the statutory basis for termination was met and that the only question remaining is whether termination is in the children's best interests. The pending drug charges are a significant factor when considering the children's best interests and issues of permanence and stability, *see Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 534 (Tex. 1987), and the strong possibility that Anderson will be sentenced to significant time in prison weighs in favor of the jury's determination that termination is in the children's best interests. Their foster parents, who have cared for them since they entered the foster-care system more than a year before trial, testified that they plan to adopt both children should termination occur, and the guardian ad litem testified that she believed the foster parents were very committed to J.A. and A.M. The children, one of whom was underweight when removed from Anderson's care and the other of whom suffers from a detachment disorder, are thriving in their foster home.

Further, at the time of trial, Anderson was engaged to a man who, although she said he was no longer involved with drugs, had at least two drug-related convictions in the past; Anderson and her father did not provide the Kanoas with promised financial support when the Kanoas took custody of the children; and Anderson admitted that she continued to use drugs even after her children were removed from the home. While we laud Anderson's conduct since her completion of the rehabilitation program, the jury could have considered her conduct leading up to the children's removal, as well as her conduct after their removal and before she admitted herself into the rehabilitation program. Finally, we must consider that Wallace had seen A.M. only twice—one of those visits was, in Anderson's words, "about 30 seconds" long—and had seen J.A. only a few times in the one or two years before the children were removed, and that the children have been together in the same foster home since their removal.

Despite our holding, however, we must note that we are troubled by this case.[4] There is a complete absence of testimony by Department caseworkers, and we are especially concerned by

_____

[4] Considering Anderson's full compliance with the Department's requirements and her progress in dealing with her drug addiction, these facts come close to giving the appearance that the Department sought to terminate her rights mostly because she faces a prison sentence. *See In re E.S.S.*, 131 S.W.3d 632, 639 (Tex. App.—Fort Worth 2004, no pet.) (imprisonment alone is not conduct that endangers child's emotional or physical well-being). Anderson relies on *Horvatich v. Texas Department of Protective and Regulatory Services* to argue that her pending drug charges do not necessitate the termination of her rights. In *Horvatich*, we overturned a decree of termination where the mother, who had been arrested for drug possession, was attending an in-patient treatment program, learning to modify her behavior, and receiving employment assistance. 78 S.W.3d 594, 598-99 (Tex. App.—Austin 2002, no pet.). However, the primary reason we reversed the decree was the Department's failure to present evidence of its future plans for the children. *Id*. at 601-02. Here, the Department presented evidence of its future plan through testimony by the foster parents and the guardian ad litem that the foster parents are committed to the children and hope to adopt them both.

the unrebutted testimony that Wallace was ignored as a possibility for placement, although he attended a hearing more than a year before trial, because the Department refused to incur the costs of a second home study.[5]  Surely, when presented with multiple possibilities for family placement, the Department does not make decisions about family placement based largely on whether one home study has already been done and does not ignore a family member who steps forward to care for the children in favor of placing the children into the foster system.  *See* Tex. Admin. Code §§ 700.1001-.1017 (relative caregiver program), .1203 (possibly permanency planning goals include relative adoption or permanent conservatorship), .1302 (Department has responsibility to work with child's parents to find safe and permanent living situation), .1320 (placement with family member is given higher priority than placement in foster care), .1715 (anyone referred by Office of Protective Services for Families and Children is eligible for home study) (2007).  We note these concerns in hopes that, if the Department is making placement decisions in the manner testified to by Anderson and Wallace, such a decision-making process will change.

### Conclusion

We certainly sympathize with Anderson, who has struggled back from drug addiction, and with her family.  This case is troubling because Anderson has fully complied with the Department's "reunification" plan in an effort to regain custody of her children, and yet the Department is seeking to terminate her rights.  However, when the record is viewed as a whole, we

---

[5]  The guardian ad litem testified that the Department informed her "that they were not going to be doing any other home studies [on Wallace's home].  They had already had the expense of one."

12

cannot hold that there is insufficient evidence for a reasonable trier of fact to have found by clear and  convincing evidence that termination is in the children's best interest.   We affirm the decree of termination.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   May 9, 2007

13