TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-06-00327-CV







Aimee Anderson, Appellant


v.


Texas Department of Family and Protective Services, Appellee







FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT

NO. 209-029-B, HONORABLE RICK MORRIS, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N



 After the Texas Department of Family and Protective Services sought to terminate
appellant Aimee Anderson's parental rights, a jury found that her rights should be terminated, and
the trial court entered a decree to that effect. Anderson contends that the evidence is insufficient to
support a finding that termination is in the children's best interest. We affirm the termination decree.

 


Factual Summary

 Anderson is the mother of J.A., born in June 2002, and A.M., born in December 2004. 
At the time of trial in May 2006, she was twenty-five years old. On February 25, 2005, a Department
caseworker, accompanied by two police officers, responded to a referral and went to the residence
of Anderson and Valentino Morales, A.M.'s father and Anderson's common-law husband, (1) to check
on the welfare of J.A. and A.M. When the caseworker and the officers arrived, the children were
not there but were with their babysitter, Alice Wooley. Anderson contacted Wooley, who brought
the children home. The police officers testified that J.A. and A.M. appeared clean and healthy. The
caseworker and the police questioned Anderson and Morales, and Anderson admitted she had used
methamphetamine the day before and submitted to a drug test. During the interview, J.A. produced
a dollar bill that concealed a small bag of methamphetamine. The police then searched the residence
and found additional methamphetamine, drug paraphernalia, $1,369 in cash, and a notebook
detailing a large number of drug transactions. Anderson testified that Morales sold drugs and that
she kept track of his transactions. She said that Morales, who was more than twice her age, was
"very dominant" and "had control over anything and everything that [she] did"; a drug-enforcement
agent testified that he believed Morales was "more in charge" of the drug dealing. 

 The children were removed from the home, but Anderson and Morales were not taken
into custody. Instead, Morales agreed to act as a confidential informant to help the police apprehend
others involved in methamphetamine distribution. In violation of this agreement, however, Morales
and Anderson continued to distribute and use drugs. Morales and Anderson were arrested on federal
drug charges on April 14, 2005, and Morales was sentenced to twenty years in federal prison. At the
time of trial, Anderson had pled guilty and was awaiting sentencing. She testified that her attorney
told her she had a chance of being placed on probation, but the drug-enforcement officer testified
that Anderson could expect to serve a minimum of ten years and was unlikely to receive probation. 

 Anderson testified that she first used a form of methamphetamine at age seventeen. 
Her drug usage remained sporadic until 2004, when it increased to several times a week; she testified
that she stopped using while she was pregnant with A.M. She admitted that even after she was
confronted by the police and her children were removed from her care, she continued to use drugs. 
In late May 2005, shortly after being released to await sentencing on the federal charges, Anderson
voluntarily checked herself into a ninety-day, in-patient drug rehabilitation program. She received
a certificate of completion on August 21, 2005, and at the time of trial, she had received her one-year
chip from Narcotics Anonymous, signifying that she had been sober and drug-free for one year. (2) She
had ended her relationship with Morales and was engaged to be married to another man, whom she
began dating in late November 2005; at the time of trial, her fiancé was in the process of getting a
divorce. Anderson testified that although her fiancé was no longer involved in drug use, he had been
convicted of drug possession three times--he was first convicted of cocaine possession in about
1992, he served a five-year prison sentence for a second conviction, and then was convicted of
marijuana possession in 1998, four months after his release from prison; the marijuana conviction
was later "thrown out." Anderson testified that she had fully complied with the Department's service
plan. Among other things, she had completed parenting classes, attended counseling, obtained
housing, and secured employment. She had made all scheduled visits with her children since their
removal, although on occasion, the children were not made available at scheduled visits.

 J.A. and A.M. were initially placed with Kiana Kanoa, Morales's daughter and
A.M.'s half-sister. Kanoa and her husband returned the children to the Department's care after about
one month, however, because they could not care for the children financially. Kanoa testified that
they thought family members could babysit the children, but were later told that the children had to
be placed in certified daycare, which costs about $900 a month, and that the Department could not
give them any financial assistance. Kanoa said that after the children were returned to the
Department, a caseworker told her that daycare had been arranged that would not have cost the
Kanoas anything, but that the Kanoas could not retract their decision to give up the children. Kanoa
testified that "another issue" that caused her and her husband to return the children to the Department
was that Anderson and her father did not provide any of the monetary support they had promised. 
The Department then placed the children with a foster family, where they have been since April
2005. Kanoa said that after it became apparent that she and her husband could not keep the children,
Anderson's father did not contact the Kanoas to say he wanted to take the children. 

 Anderson testified that if she were sent to prison, she wanted the children placed with
her father, Tim Wallace. She initially hoped Kanoa could keep the children because they would be
closer to her. She testified that the Department refused to do a home study on Wallace and said she
was told that the Department would "only allow one home study for this case" and that she would
have to raise $600 to have a study done on her father's home. When the Department noted that
Wallace had not filed a plea in intervention until two months before trial, Anderson said Wallace had
attended a hearing and spoken to a Department caseworker in April 2005, but had not gotten
anywhere; he also attempted to see the children during one visit, but was asked to leave. She agreed
when asked by the Department's attorney whether, if her father had filed a petition in intervention
a year earlier, shortly after their removal, she and the Department "might not be here" in a
termination proceeding, but said, "I didn't say it was the Department's fault. But how am I supposed
to have a home study if nobody will order one? How am I suppose[d] to bring my dad in without
a home study? I can't." She testified that Wallace had seen J.A. "quite a few times" and had seen
A.M. twice, although the second time he spent only a few minutes with her because the Department
asked him to leave; the last time he saw both children was more than a year before trial.

 Tim Wallace testified that he would take the children if Anderson was sentenced to
federal prison. He testified that he and his wife had attempted to inform the Department that they
were interested in taking custody of Anderson's children starting in April 2005, when they attended
a hearing and spoke to a Department caseworker. They were told that the Department had already
done one home study and "that another one would not be done by the State." He testified that shortly
before trial, he moved to Kentucky from Houston, and that Anderson and her mother had paid for
a home study on Wallace's house in Kentucky. The home study, which was positive about Wallace
and his family and was introduced into evidence, was begun in February 2006 and completed in early
May, about ten days before trial; the study was delayed by his move and his mother's death. He
testified that he attended at least one other hearing, but was not allowed to testify. He said, "Every
time I tried to contact [the Department] at the hearing, I ran into a brick wall." Wallace said he had
visited with J.A. perhaps four times between the time J.A. was about one-and-a-half years old and
when the Department took custody of the children. Asked whether he had considered how it would
affect the children to be removed from "the only stable home that they've had," Wallace said, "I
believe they're better off with family blood."

 The children's foster mother testified that when A.M. entered into her care, her
pediatrician diagnosed a failure to thrive, meaning that A.M. was well below normal height and
weight standards; after several months in foster care, A.M. reached the 75th percentile on growth
charts. (3) The foster mother also testified that J.A. suffers from an attachment disorder, one cause of
which is the "absence" of drug-addicted parents. Once a week, the children's foster mother drives
J.A. to a specialist more than one hour away for therapy for this disorder. She and her husband
testified that they would adopt J.A. and A.M. if their parents' rights were terminated. 

 Carla Wright, who was appointed as the children's guardian ad litem in December
2005, recommended that Anderson's parental rights be terminated so that J.A. and A.M. could be
adopted by their foster parents. She testified that she had "lots of telephone contacts" with Anderson
and the foster parents and had observed the foster home once and one visit between Anderson and
the children. Wright acknowledged that Anderson had come a long way and appeared to be doing
well, but believed termination and adoption were in the children's best interests. She testified that
she struggled with her decision, but her concern was that Anderson would be unable to provide
permanency for her children due to the pending federal charges; she said, "It's not the children's fault
that there's a criminal case pending. And they need some type of permanency in their life." She
testified that the children had been with their foster parents for more than a year and were doing
"extremely well." Wright said Anderson mentioned her father for placement in January 2006. At
that time, Wright was concerned because Wallace was between homes due to his move and because
the Department had said they were not going to pay for a second home study. Wright told Anderson
at that time that if she and her family wanted a study done on Wallace's home, she and her family
would have to pay for it themselves.

 Given her success in overcoming addiction, her compliance with the Department's
reunification plan, and the assistance offered by Wallace, Anderson argues that the evidence is
factually insufficient to support the jury's finding that termination is in the children's best interest.



Standard of Review

 To terminate an individual's parental rights, Texas law requires a district court to find
by clear and convincing evidence that (1) the parent has engaged in one of the statutory grounds for
termination, and (2) the termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001
(West Supp. 2006). Anderson does not contest that she engaged in one of the statutory grounds for
termination. Therefore, the only question is whether the jury could have found by clear and
convincing evidence that terminating Anderson's parental rights is in the best interest of her children.

 Texas courts recognize that the natural right "between parents and their children is
one of constitutional dimensions." In re J.W.T., 872 S.W.2d 189, 194-95 (Tex. 1994) (quoting
Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex. 1976)). Given the importance of this right, due
process requires that the State justify any termination of the parent-child relationship by clear and
convincing evidence. Tex. Fam. Code Ann. § 161.001; In re C.H., 89 S.W.3d 17, 23 (Tex. 2002);
Horvatich v. Texas Dep't of Protective & Regulatory Servs., 78 S.W.3d 594, 596
(Tex. App.--Austin 2002, no pet.). Clear and convincing evidence is that degree of proof that
produces in the mind of the trier of fact a firm belief or conviction about the truth of the allegations
supporting termination. C.H., 89 S.W.3d at 23. 

 The focus of the best-interest determination is on the child, not on the parent. See
D.O. v. Texas Dep't of Human Servs., 851 S.W.2d 351, 358 (Tex. App.--Austin 1993, no writ). 
However, there is a strong presumption that it is in the child's best interest to preserve the
parent-child relationship. Swate v. Swate, 72 S.W.3d 763, 767 (Tex. App.--Waco 2002,
pet. denied). In deciding whether to override this presumption, factors to be considered include: the
child's desires; the child's emotional and physical needs now and in the future; the emotional or
physical danger to the child now and in the future; the parenting abilities of the individuals seeking
custody; the programs available to assist those individuals to promote the child's best interest; the
plans for the child by those individuals or the agency seeking custody; the stability of the home or
proposed placement; the parent's acts or omissions that may indicate that the existing parent-child
relationship is not a proper one; and any excuse for the parent's acts or omissions. Holley v. Adams,
544 S.W.2d 367, 372 (Tex. 1976). Permanence is of paramount importance in considering a child's
present and future needs. Dupree v. Texas Dep't of Protective & Regulatory Servs., 907 S.W.2d 81,
87 (Tex. App.--Dallas 1995, no pet.); see In re T.D.C., 91 S.W.3d 865, 873 (Tex. App.--Fort Worth
2002, pet. denied); In re M.A.N.M., 75 S.W.3d 73, 99 (Tex. App.--San Antonio 2002, no pet.). 
Establishing a permanent, stable home for a child is a compelling state interest. Dupree,
907 S.W.2d at 87. A trier of fact may compare the parent's and the State's permanency plans in
determining the best interest of the child. See D.O., 851 S.W.2d at 358.

 In reviewing the factual sufficiency of the evidence, we must defer to the trier of
fact's conclusions and "give due consideration to evidence that the factfinder could reasonably have
found to be clear and convincing." In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). If a reasonable
trier of fact could have formed a firm belief or conviction to support its finding of termination, then
the evidence is factually sufficient. Id. We must consider whether the disputed evidence is such that
a reasonable trier of fact could not have resolved that evidence in favor of its finding; only if, when
viewed in the context of the entire record, "the disputed evidence that a reasonable factfinder could
not have credited in favor of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction," is the evidence factually insufficient. Id. In applying these
standards of review, "we consider the evidence that supports a deemed finding regarding best interest
and the undisputed evidence. We do not consider evidence that a factfinder reasonably could have
disbelieved." Id. at 268.



Discussion

 This is not an easy case and we are somewhat troubled by its outcome. Anderson has
made significant progress in recovering from drug addiction and complying with the court orders in
this case. She has most notably achieved and maintained her sobriety. She has also obtained
employment and appropriate housing, completed parenting classes and a psychological evaluation,
and submitted to and passed randomly administered drug tests. Despite these accomplishments,
however, we can only conclude that there is sufficient evidence on which a reasonable trier of fact
could have based a finding that termination of Anderson's rights is in the children's best interests.

 Anderson has federal drug charges pending against her and, although she hopes to
qualify for probation, a federal drug agent testified that she was likely to be sentenced to ten years
in prison. Wallace testified that he would take the children in the event Anderson is sentenced to
federal prison, but he lives in another state, far from where Anderson would be serving her sentence,
he did not file a petition in intervention until shortly before trial, Wallace did not pay for the home
study himself, Anderson and her family did not obtain the home study on Wallace until shortly
before trial, and Anderson's attorney apparently never called Wallace to testify in earlier hearings.

 "While parental rights are of constitutional magnitude, they are not absolute," and it
is "essential that emotional and physical interests of the child not be sacrificed merely to preserve
that right." C.H., 89 S.W.3d at 26. The Holley factors are not exhaustive, and not every factor must
be shown before parental rights may be terminated. Id. at 27. We must "maintain the respective
constitutional roles of juries and appellate courts," and may not reverse the trial court's judgment
unless a reasonable jury could not have formed a firm conviction or belief that terminating
Anderson's rights is in the children's best interests. Id. at 26-27. 

 Anderson concedes that the statutory basis for termination was met and that the only
question remaining is whether termination is in the children's best interests. The pending drug
charges are a significant factor when considering the children's best interests and issues of
permanence and stability, see Texas Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 534
(Tex. 1987), and the strong possibility that Anderson will be sentenced to significant time in prison
weighs in favor of the jury's determination that termination is in the children's best interests. Their
foster parents, who have cared for them since they entered the foster-care system more than a year
before trial, testified that they plan to adopt both children should termination occur, and the guardian
ad litem testified that she believed the foster parents were very committed to J.A. and A.M. The
children, one of whom was underweight when removed from Anderson's care and the other of whom
suffers from a detachment disorder, are thriving in their foster home.

 Further, at the time of trial, Anderson was engaged to a man who, although she said
he was no longer involved with drugs, had at least two drug-related convictions in the past; Anderson
and her father did not provide the Kanoas with promised financial support when the Kanoas took
custody of the children; and Anderson admitted that she continued to use drugs even after her
children were removed from the home. While we laud Anderson's conduct since her completion of
the rehabilitation program, the jury could have considered her conduct leading up to the children's
removal, as well as her conduct after their removal and before she admitted herself into the
rehabilitation program. Finally, we must consider that Wallace had seen A.M. only twice--one of
those visits was, in Anderson's words, "about 30 seconds" long--and had seen J.A. only a few times
in the one or two years before the children were removed, and that the children have been together
in the same foster home since their removal.

 Despite our holding, however, we must note that we are troubled by this case. (4) There
is a complete absence of testimony by Department caseworkers, and we are especially concerned by
the unrebutted testimony that Wallace was ignored as a possibility for placement, although he
attended a hearing more than a year before trial, because the Department refused to incur the costs
of a second home study. (5) Surely, when presented with multiple possibilities for family placement,
the Department does not make decisions about family placement based largely on whether one home
study has already been done and does not ignore a family member who steps forward to care for the
children in favor of placing the children into the foster system. See Tex. Admin. Code §§ 700.1001-.1017 (relative caregiver program), .1203 (possibly permanency planning goals include relative
adoption or permanent conservatorship), .1302 (Department has responsibility to work with child's
parents to find safe and permanent living situation), .1320 (placement with family member is given
higher priority than placement in foster care), .1715 (anyone referred by Office of Protective Services
for Families and Children is eligible for home study) (2007). We note these concerns in hopes that,
if the Department is making placement decisions in the manner testified to by Anderson and
Wallace, such a decision-making process will change. 


Conclusion

 We certainly sympathize with Anderson, who has struggled back from drug addiction,
and with her family. This case is troubling because Anderson has fully complied with the
Department's "reunification" plan in an effort to regain custody of her children, and yet the
Department is seeking to terminate her rights. However, when the record is viewed as a whole, we
cannot hold that there is insufficient evidence for a reasonable trier of fact to have found by clear
and  convincing evidence that termination is in the children's best interest. We affirm the decree
of termination.



 __________________________________________

 David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: May 9, 2007
1. Morales's parental rights to A.M. were terminated in the same proceeding, as were the parental
rights of J.A.'s father. Neither father is a party to this appeal.
2. In the year before trial and since her release from the rehabilitation program, Anderson had paid
for and passed random drug tests administered every one to three weeks.
3. There was testimony that Anderson and Morales, A.M.'s parents, both have slight builds.
4. Considering Anderson's full compliance with the Department's requirements and her progress in
dealing with her drug addiction, these facts come close to giving the appearance that the Department
sought to terminate her rights mostly because she faces a prison sentence. See In re E.S.S., 131
S.W.3d 632, 639 (Tex. App.--Fort Worth 2004, no pet.) (imprisonment alone is not conduct that
endangers child's emotional or physical well-being). Anderson relies on Horvatich v. Texas
Department of Protective and Regulatory Services to argue that her pending drug charges do not
necessitate the termination of her rights. In Horvatich, we overturned a decree of termination where
the mother, who had been arrested for drug possession, was attending an in-patient treatment
program, learning to modify her behavior, and receiving employment assistance. 78 S.W.3d 594,
598-99 (Tex. App.--Austin 2002, no pet.). However, the primary reason we reversed the decree was
the Department's failure to present evidence of its future plans for the children. Id. at 601-02. Here,
the Department presented evidence of its future plan through testimony by the foster parents and the
guardian ad litem that the foster parents are committed to the children and hope to adopt them both.
5. The guardian ad litem testified that the Department informed her "that they were not going to be
doing any other home studies [on Wallace's home]. They had already had the expense of one."